NATHAN LIEBERMAN,

vs.

THE FIRST NATIONAL BANK OF WILMINGTON, AND PIERCE GOULD, SHERIFF.

*New Castle, Sept. T.* 1898.

Negligence on the part of the officers and directors of a bank in the management of its affairs and the examinations of its books, so as to discover the defalcations of a paying teller, will not discharge his sureties on his official bond, given for the faithful performance of his duties.

The fact that it was made part of the duty of the paying teller of a bank to act also as book-keeper, so far as to keep the individual deposit ledger, is not a defense to a suit, on his official bond although the defalcations made have been connected with and made possible by reason of his employment in the bank as such book-keeper; it having been shown that it was the custom, at that time, of a large majority of the banks of the State, to impose that duty upon the paying teller, and was considered by those banks to be a legitimate part of his duty.

No statements made by the cashier of a bank could in any way affect the responsibility of a surety for the paying teller, they being fellow employees, and the cashier having no more authority to represent the corporation, in such a matter, than any clerk or book-keeper in its employ.

Incorrect reports of the condition of a national bank made pursuant to sec. 5211 of the Revised Statutes of the United States cannot be reasonably held to have operated as an inducement to anyone to become surety on the bond of an employee of a bank, and cannot be so considered as to make the validity of the bond depend upon their correctness.

The object of the publication of statements of the condition of a national bank under U. S. Rev. Stat., sec. 5211, is to notify the stockholders and depositors and those intending to become such, or who might in any manner entrust their money to the bank, of its financial condition; but such statements can have no bearing upon the subject matter of the contract of suretyship.

A warrant of attorney to confess judgment has no effect, in this State, to take a case out of the statute which provides that no suit shall be brought upon the bond given to a bank or other corporation, for good behavior, or faithful discharge of his duties by an officer thereof, after the expiration of two years from the accruing of the cause of action.

The statutory bar against suits on official bonds, which provides that they must be commenced within two years after the accruing of the cause of action cannot be set up by a surety before the lapse of the prescribed term after the discovery of the fraud which constituted the breach of the bond.

Where the collection of a judgment entered by virtue of warrant of attorney against the surety in the official bond of a bank officer who had defaulted, is restrained by injunction, and it appears that at the time of entering the judgment, the amount of the defalcations with interest thereon equals or exceeds the penalty, for which judgment was entered, the plaintiff is entitled to collect the full amount of the judgment with interest from the time of entry.

The cases of *Whittaker vs. Parker*, 2 *Harring.* 413, and 4 *Harring.* 527; and *Sparks vs. Farmers Bank*, 3 *Del. Ch.* 275 followed and approved.

BILL FOR INJUNCTION BY THE SURETY IN THE BOND OF AN OFFICER OF A BANK.—The complainant was surety in two bonds of Peter T. E. Smith, given to the defendant bank, to secure the faithful performance of his duties as paying teller. The first bond was dated Nov. 1, 1879, for $15,000.00 and on February 24, 1893, judgment was entered thereon against the complainant and his co-sureties. Prior to the execution of this bond it was in proof that complainant then a large depositor in the bank consulted the cashier, with respect to the risk of becoming surety for Smith, and was by him assured that the books and accounts of Smith were all right and that he would run no risk. This assurance was repeated on the day the bond was executed and before complainant signed it.

It was also in proof that a report of the condition of the bank under date of October 2, 1879, was made to the Comptroller of the Currency, under *sec.* 5211, *U. S. Rev. Stat.*, sworn to by the cashier and attested by the directors, and pub-

lished in Wilmington newspapers. The statement, accounting for all funds of the bank, was shown to be false, in that the individual deposits appearing upon the books of the bank, actually $4,600 more than the amount set forth in the published statement, that amount being the amount of the teller's defalcations at that time.

On July 6, 1885, complainant executed another bond for $15,000, as surety for Smith, on which judgment was entered on February 24, 1893. Before executing the second bond, complainant had conversations with the cashier, similar to those had prior to the execution of the first bond. A statement of the condition of the bank, similar to that above stated, under date of May 6, 1885, was made and published, being sworn to and attested by the directors. In this the amount of individual balances due, was understated by $15,775.08, which was the amount of defalcations of the teller up to May 6, 1885.

On the last mentioned judgment execution was issued October 19, 1893, and the property of the complainant levied on, and the sheriff was proceeding to advertise and sell the same, when further proceedings were arrested by a preliminary injunction granted by Chancellor Wolcott, November 6, 1893.

The liability of complainant as surety in the second bond continued from its date until July 5, 1891, when a new bond was given with The American Surety Co. as surety.

The defalcations continued during the whole period covered by the second bond and until February, 1893, when Smith resigned.

There was much proof, showing the method by which the fraudulent misappropriations of money were made and concealed, which need not be stated in detail, but the conclusion reached by the Court was that the defalcations under the first bond amounted to $11,650, and those under the second bond to $27,750, each of which sums with interest on the several items thereof, amounted to more than the amounts of the bonds under which complainant and his co-sureties were responsible, respectively.

The cause came on to be heard upon bill, answers and proofs.

*Benjamin Nields*, for complainant.

The injunction in this case should be made perpetual upon the two grounds:

First. That the bonds signed by the complainant are void as to him because be became surety thereon by reason of the fraudulent representations of the defendant.

Second. That the right of the First National Bank to proceed on said bonds, or either of them, is barred by the statutes of this State.

. 1. Fraudulent representations.

If the false statements made by the cashier, or those made by the bank, which the complainant believed to be true, and thereby became surety, were negligently or carelessly made without knowing whether the same were true or false, such statements are held in equity to be fraudulent representations, notwithstanding the cashier and directors may have believed them to be true. 2 *Brandt, Sur. G. sec.* 422; 2 *Pom. Eq. Jur. secs.* 887–8; 1 *Big. Fraud,* 411, 414, 520.

There is a broad distinction between an action on the case for deceit, for fraudulent misrepresentations respecting the subject matter of a contract, and a suit in equity for the rescission or avoidance of a contract upon the ground of fraudulent representations respecting the subject matter of a contract. In the equity suit it is only necessary to prove the misrepresentation; and the contract, though honestly made, if obtained by it, cannot stand. *Derry vs. Peek, L. R.* 14 *App. Cas.* 337, 360; *Arkwright vs. Newbold, L. R.* 17*Ch. Div.* 320; *Smith vs. Chadwick, L. R.* 9 *App. Cas.* 193; *Reese River Silver Mining Co. vs. Smith, L. R.* 4 *H. L.* 64, 79; *Central Ry. Co. of Venezuela vs. Kisch, L. R.* 2 *H. L.* 99; *Redgrave vs. Hurd, L. R.* 20 *Ch. Div.* 1; *Graves et al. vs. Lebanon National Bank,* 10 *Bush* 23; *Rawlins vs. Wickham,* 3 *D. G. & J.* 304 *Morse on Banking,* 226.

The facts in this case clearly warrant the Court in determining not only that the complainant could avoid the bond on the ground of misrepresentation, but that the facts con-

stitute fraud which would be a ground of action and *a fortiori* a ground of defense.  1 *Big. Fraud* 509, 513; *Townsend vs. Williams*, 117 *N. C.* 330, 23 *S. E.* 461; *Solomon et al. vs. Bates et al.*, 118 *N. C.* 311, 24 *S. E.* 478; *Cole vs. Cassidy*, 138 *Mass.* 437; *Tate vs. Bates*, 118 *N. C.* 287, 24 *S. E.* 482.

The law contained in the authorities heretofore cited is clear, that in any case where one party to a contract makes false representations to the other party, material to the contract, the contract can be avoided.  This rule of law is of still more conclusive application when the false representation is made by a creditor to a surety upon entering into a contract of suretyship.

2. The Statute of Limitations.

The right of the First National Bank to proceed on said bonds, or either of them, is barred by the statutes of this State.

The statute of this state provides that no action shall be taken upon a bond given to a bank or corporation, by any officer thereof for his good behavior, after the expiration of two years from the accruing of the cause of action, or after the expiration of six years from the date of such bond.  *Rev. Code* (1893), 889.  This is not a general statute of limitation but applies only to obligations given to a corporation by its officer for good behavior, faithful discharge of his duties, or touching the execution of his office, and has no application to other contracts.

To entitle the bank to recover, a cause of action must have accrued within six years after the date of the bond and the action must be brought within two years from the accruing of the cause of action.  No breach of the bond, therefore, occuring more than two years before action would constitute a cause of action.

The several amounts taken prior to and including April 11, 1891, were all taken more than two years prior to entering judgment, and the three amounts taken after that date were all taken two years before execution was issued on said judgment.

The entry of judgment on the bond pursuant to the warrant of attorney was not an action brought upon the bond, since the law nowhere authorizes the corporation to take a warrant of attorney to enter judgment on such bonds, and if they were so authorized, judgment might be entered immediately and before the breach; therefore, the entry of judgment could not be such an action as was intended by the statute.

The execution issued against the complainant was an action. It was an action to enforce a liability and "the word action embraces all civil proceedings to enforce a liability." *Martin vs. Talley*, 72 *Ala.*, 33.

The cause of action having accrued more than two years before the execution was issued, the execution is such an action as comes within the terms of the statute and is barred. *Grimshaw vs. Wilmington*, 5 *Del. Ch.* 183; *Walker vs. Whitehead*, 16 *Wall.* 314; *Hudson vs. Bishop*, 32 *Fed. Rep.* 519.

Equity will not enlarge the legal liability of a party who is under no moral or equitable obligation. Equity will not hold a surety liable where he is discharged at law. *United States vs. Price*, 9 *How.* 83; *Miller vs. Stewart*, 4 *Wash. C. C.* 28, s. c. 9 *Wheat.* 680; 2 *Wood, Lim.* 706; *Hunt vs. Rousmaniere's Adm.*, 1 *Pet.* 1; *Wright vs. Russell*, 3 *Wilson*, 530; *Simpson vs. Field*, 2 *Ch. Cas.* 22; *Waters vs. Riley*, 2 *Harr. & G.* 310; *Weaver vs. Shyrock*, 6 *S. & R.* 262; *Kennedy vs. Carpenter*, 2 *Wharton*, 361; *Harrison, Exr. of Minge vs. Field*, 2 *Wash. (Va.)* 136; *Dixon vs. Vandenburg*, 35 *N. J. Eq.* 47; *Brandt Sur. & G. sec.* 117; *Risley vs. Brown*, 67 *N. Y.* 160; *Pickersgill vs. Lahens*, 15 *Wall.* 140; *Roddy vs. United States*, 3 *Wall. Jr.* 358, *Fed. Cas.* 11990; *Fulden et al. vs. Lahens et al.*, 6 *Blatch.* 525; *Pratt et al. vs. Northam et al.*, 5 *Mason*, 95; *Sims vs. Slocum*, 3 *Cranch* 307; *Ammidon vs. Smith*, 1 *Wheat.* 447; *Leggett et al. vs. Humphreys*, 21 *How.* 66; *Getty vs. Binsse et al.*, 49 *N. Y.* 385.

The statute of limitations commences running in favor of a surety or guarantor from the time he is liable to suit, and this, as already seen, may or may not be the same time the principal becomes so liable.1 *Brandt, Sur. & G. sec.* 161; *St. Louis vs. Daily et al.*, 4 *Mo. App.* 172; *United States vs.*

*Babbitt*, 95 *U. S.* 334; *People vs. Burkhart*, 76 *Cal.* 606; *Grovenor vs. Stonum*, 11 *Ala.* 679; *Colvin vs. Buckle*, 8 *M. & W.* 680.

*Bradford* and *Vandegrift*, for respondents.

A sufficient reply to the principal ground of relief set up by the complainant,—the statute of limitation on such ¦bonds —is that the paying teller fraudulently concealed his defalcations for more than two years and until more than six years after the dates of the bonds.

Concealed fraud is a good replication to such a plea of the statute of limitations. *Sparks vs. Farmers' Bank*, 3 *Del. Ch.* 274; *Bradford vs. McCormick*, 71 *Iowa* 129, 32 *N. W.* 93; *Boone Co. vs. Jones, et al.*, 54 *Iowa* 699, 2 *N. W.* 987; *Bailey vs. Glover*, 21 *Wall.* 342; *Kirby vs. Lake Shore*, 120 *U. S.* 130; *Reynolds vs. Hennessy*, 17 *R. I.* 169, 23 *Atl.* 639; *Snodgrass vs. Branch Bank*, 25 *Ala.* 161, 60 *Am. Dec.* 505; *Bowne vs. Mt. Holly National Bank*, 45 *N. J. L.* 360; *Tapley vs. Martin*, 116 *Mass.* 275; *Western N. Y. Life Insurance Co. vs. Clinton*, 66 *N. Y.* 326; *Bostwick, Receiver, vs. Van Voorhis*, 91 *N. Y.* 353.

It is urged that while Smith, the principal, would not be allowed to plea the statute, yet sureties, being favorably regarded by the law, may take advantage of it. Of the cases just cited the first three were against sureties, and in many others the courts held that what estops the principal estops the surety. *McCabe vs. Raney*, 32 *Ind.* 309; *Commonwealth vs. Kendig*, 2 *Barr* 448; *Zent's Exr. vs. Hart*, 8 *Pa. St.* 337; *Wayne vs. Commercial Nat. Bank*, 52 *Pa. St.* 343; *Amherst Bank vs. Root*, 2 *Metc.* 522; *Weston vs. Sprague*, 54 *Vt.* 395; *Charles vs. Hoskins*, 14 *Ia.* 471; *Pendleton vs. Bank of Ky.*, 1 *T. B. Mon.* 181.

To plead any statute in this case is against good conscience, and therefore equity will not permit such a plea. Of cases above cited, see especially, *Reynolds vs. Hennessy, Sparks vs. Farmers' Bank, Commonwealth vs. Kendig* and also *Bond vs. Hopkins*, 1 *Sch. & Lef.* 413.

As it has been said by our own courts, the statute of limitations is a good shield, but it should not be used to protect

fraud. *Chambers vs. Fennimore's Adm'r.*, 4 *Harring*. 368, 376.

The effect of such a plea in this case would be to enable the complainant to take advantage of the very wrong against which he convenanted to protect the bank. *Sparks vs. Farmers' Bank, supra.*

The decision by Chancellor Saulsbury in *Grimshaw vs. Wilmington*, 5 *Del. Ch.* 183, seems to have been rendered without careful consideration as it manifestly mistates the scope and application of the statute. It is impossible that the decision can be sustained in so far as it holds that judgments mentioned in it were nullities because they had not been entered within the statutory period. It is only the latter portion of the statute which refers to judgments, and then only upon causes of action accruing after the expiration of six years from the date of such bond. If the judgments were for a cause of action accruing within six years from the date of the bond, then the former portion of the statute was either applicable to these judgments as a limitation to the remedy, or not applicable to the case at all. It is, therefore, difficult to understand how the Chancellor, in *Grimshaw vs. Wilmington*, could have treated the judgments as nullities and not merely voidable or defeasible. It is to be observed that this decision does not touch the question of the effect of concealed fraud upon the running of the statute, in relation to the surety, except in so far as there is a general recognition of the principle, that concealed fraud will remove the bar of the statute, in favor of the defrauded party. The case of concealed fraud is not excepted from the statute of limitations, but furnishes an equitable estoppel *in pais* by which the party to the fraud, and his privies should be estopped from setting up the statutory bar, for the statute does not execute itself. The bonds executed by the complainant were without limit as to time, and so long as their validity continued there was contractual privity between Smith and his sureties by which the surety would be affected by the fraud of their principal.

The only judicial decision in this State upon the effect of concealed fraud as affecting the rights of sureties, under the

statute of limitation, is *Sparks vs. Farmers' Bank*, in which Chancellor Bates rendered an elaborate decision and held that such fraud would preclude an innocent surety from taking advantage of the statute until after the expiration of the statutory period from the discovery of the fraud.

There is no authority in this State opposed to that decision, and, until the question shall be otherwise determined by the Court of Errors and Appeals, it is respectfully submitted that this Court should follow it.

The reports of the bank to the Comptroller of the Currency, made and published under the *U. S. Revised Statutes, sec.* 5211, upon which the complainant claims to have relied in becoming a surety, were not made or published for the benefit of persons likely to become sureties on bonds of the officers of the bank. *Savings Bank vs. Albee*, 63 *N. H.* 152. The day's work of which these reports are transcripts may be any day the Comptroller specifies, so that it is a past day. Many days may intervene between that past day and the day the surety signs the bond. The bank owed no duty to the surety to make correct report. Nothing of the kind was specified in the bond. By them he and the other sureties undertook for Smith's good behavior without qualification.

Numerous examinations of the bank by Government experts and others failed to discover the embezzlement so that there was no fraud on the part of the bank, and the evidence shows good faith, even if there was a lack of diligence on the part of the officers of the bank. Connivance on the part of the bank would be the only thing that would discharge the surety. *Sparks vs. Farmers' Bank*, 3 *Del. Ch.* 301–4; *United States vs. Kirkpatrick*, 9 *Wheat.* 720; *Minor vs. Mechanics' Bank*, 1 *Pet.* 46; *Taylor vs. Bank*, 2 *J. J. Marsh.* 565; *Phillips vs. Bossard*, 35 *Fed. Rep.* 99; *Tapley vs. Martin*, 116 *Mass.* 275. Mere delay of the creditor is not sufficient. *Hunt vs. Bridgham*, 2 *Pick.* 584.

No concealment of the Bank's condition was intended by the published statements, because nothing was known to be wrong. *Wayne vs. Commercial Nat. Bank*, 52 *Pa. St.* 343; *Savings Bank vs. Albee*, 63 *N. H.* 152.

The defense urged by the complainant as against his liability, that the embezzlement was caused by the paying teller acting as book-keeper, does not seem to be sustained by the proofs. He did not become surety for Smith as paying teller. The bonds name Smith as "Teller," but nowhere specified that he should not be book-keeper. The recital and condition of the bonds were amply broad to cover any duty the bank should choose to assign to Smith.

They contemplate, name and specify the keeping of books and accounts as part of Smith's duty, and one of the last conditions named in these bonds is that Smith "shall deliver * * * to the said * * * Bank * * all such property, books, papers and effects, or other things whatsoever belonging to the said * * * Bank * * * upon the conclusion of his said office as Teller as aforesaid, as he may have been entrusted with at any time in performing his duties as Teller as aforesaid, *or had in his possession in any way whatsoever.*"

This language would seem to be a full answer to the defense set up and now under consideration. *Minors vs. Mechanics' Bank*, 1 *Pet.* 46; *Mayor vs. Kelly*, 98 *N. Y.* 467; *Detroit Savings Bank vs. Ziegler*, 49 *Mich.* 157.

The fact that the bank never presented any stated account to the complainant, and that its books do not furnish any account, is urged as a defense against its claim. To this it may be answered.

(1) If judgments were entered for too much the collection of any surplus could be enjoined, but the bill makes no such claim.

(2) The entry of judgment was notice of the amount claimed.

(3) It appears that the complainant was notified of the defalcation the day after the bank knew of it, and a statement was sent to him as soon as his liability could be ascertained. He made no response and took the position that the amount claimed was not a factor, because there was absolutely no liability.

(4) There was no duty, either expressed or implied, on the part of the bank to give Lieberman an account of the defalcations.

(5) During the taking of testimony complainant's solicitor was furnished, at his own request, with an itemized statement of the embezzlements showing dates and amounts.

Under the facts in this case the only limitation of the complainant's liability as surety, was Smith's employment by the bank, his payment and delivery to it at the end of his employment of all money and property in his hands, and otherwise fully complying with the terms of the bonds. His failure so to do was a breach for which his surety is liable, and the statutes of limitations cannot shield him. *Bank vs. Wollaston*, 3 *Harring.* 96; *Sparks vs. Farmers' Bank*, 3 *Del. Ch.* 289, 306.

It is further submitted that if the statutes of limitations upon which the other side rely ever were applicable, the bar of the statutes was raised by Smith's acknowledgement of the debt. *Burleigh vs. Stott*, 8 *B. & C.* 36; *Channel vs. Ditchman*, 5 *M. & W.* 494; *Boone Co. vs. Jones*, 54 *Iowa* 699, 2 *N. W.* 91; *Zent's Exr. vs. Heart*, 8 *Pa. St.* 337, 341; *Kendig vs. Commonwealth*, 2 *Barr* 452; *Chambers vs. Fennimore's Adm'r.* 4 *Harring.* 368, 374; *Newlin vs. Duncan*, 1 *Harring* 204; *Robinson vs. Burton*, 1 *Houst.* 540.

It cannot be successfully contended that the statute here set up as a bar is not a statute of limitations, and to be construed according to rules and principles governing them. This has been decided in this State. *Parker vs. Whitaker*, 4 *Harring.* 527, 529.

In this State the defense of the statute must be pleaded; it will not be presumed. *Whitaker vs. Parker*, 2 *Harring*, 416, 4 *Harring.* 529. The plea is not favored. *Burton vs. Waples*, 3 *Harring.* 75; *Waples vs. McGee*, 2 *Harring.* 444. It is prescribed as one of the terms of opening a judgment that the statute shall not be pleaded. *Whitaker vs. Parker*, 2 *Harring.* 416.

In the light of the course of decisions in this State, and of the cases cited supra, such as *Bailey vs. Glover*, 21 *Wall.*

342, it can hardly be doubted that the Superior Court would consider "concealed fraud," a good replication.

If the contention of the complainant be adopted, that the cause of action accruing when the theft was committed, then, under each bond he would be liable for abstractions accruing within six years from its date. *Pickering vs. Day*, 3 *Houst.* 474. But if it be held that the action did not accrue until the theft was discovered, the complainant must depend upon that part of the statute which prevents any action or proceeding after six years from the date of the bond, and the anomalous condition would be presented of having a remedy destroyed before the cause of action accrued. This is an impossible conclusion. *Layton vs. State*, 4 *Harring.* 34–5.

Most of the cases cited for the complainant are not applicable to the present case. In general they are cases of rescission, the doctrine of which is inapplicable to a contract of suretyship. It is well settled that the rescission will not be decreed unless the parties can be placed in *statu quo*. *Hunt vs. Silk*, 5 *East* 449; *Morse vs. Brackett*, 98 *Mass.* 205, 209; *Milner vs. Bradley*, 22 *Pick.* 457; *Harnor vs. Groves*, 15 *C. B.* 667; not even on account of fraud*; Norton vs. Young*, 3 *Greenl.* 30; *Cushing vs. Wyman*, 38 *Me.* 589; *Cook vs. Gilman*, 34 *N. H.* 556.

THE CHANCELLOR—

This is a bill in equity by one of the sureties on the official bond of Peter T. E. Smith, late paying teller of the First National Bank of the City of Wilmington, to restrain the bank from proceeding at law to collect from the complainant any of certain defalcations of the said Smith committed while paying teller of the said bank.

The bonds bore date respectively November 1, 1879, and July 6, 1885. The complainant was one of the sureties in each bond, his co-sureties on the first bond being John Sparks, Christian Messick and Joshua Maris, and on the second bond John Sparks and Hannah L. Sparks. The two bonds were precisely alike in their terms, being each in the penal sum of Fifteen Thousand Dollars, and upon condition that:

"If the above bounden Peter T. E. Smith shall behave himself well and truly and diligently execute and discharge his trust as teller of the said 'The First National Bank of Wilmington,' and faithfully perform all the duties thereof and shall and do make and give or cause to be made and given unto the said 'The First National Bank of Wilmington,' and its successors and assigns for and during the entire time the said Peter T. E. Smith shall or may be employed in the said office of teller as aforesaid, full satisfaction, recompense and account of and for all such moneys, bills, notes, goods, wares, books, papers, accounts and effects, or other things whatsoever of and belonging to the said 'The First National Bank of Wilmington,' or its successors and assigns, as he may have the care, charge, supervision or possession of in performing the duties devolving upon him as teller as aforesaid; and shall deliver to the said 'The First National Bank of Wilmington,' its successors or assigns, all such property, books, papers and effects, or other things whatsoever belonging to the said 'The First National Bank of Wilmington,' its successors or assigns, upon the conclusion of his said office as teller as aforesaid, as he may have been entrusted with at any time in performing his duties as teller as aforesaid, or had in his possession in any way whatsoever, then the above obligation to be void, otherwise to be and remain in full force and virtue."

Each bond contained a warrant of attorney for confessing judgment, which had been executed by the entry of judgments, February 24, 1893, in the Superior Court of the State of Delaware in and for New Castle County, being No. 299 on the bond of November 1, 1879, and 301 on the bond of July 6, 1885, both of the FebruaryTerm, 1893.

On the 19th day of October, 1893, the bank caused a writ of execution for $15,000 to be issued upon said judgment No. 301 directed to Pierce Gould, Sheriff, as aforesaid, who levied upon and took into execution all the goods and chattels of the complainant and was about to advertise and sell the same when the complainant filed his bill in equity and the late

Chancellor Wolcott granted the following preliminary injunction:

"And now to wit, this sixth day of November, A. D., 1893, the foregoing bill of complaint having been read and considered, it is ordered by the Court that a preliminary injunction be issued to restrain the First National Bank of Wilmington, its officers, agents and attorneys from taking any action or proceedings upon said judgment, and against Pierce Gould, Sheriff of New Castle County, his agents and attorneys, from disturbing, removing, advertising or selling any of the goods and chattels, property or effects of the said complainant, under said writ of execution, until the further order of this Court upon the complainant executing an injunction bond in the penalty of $30,000, with John T. Dickey as surety."

Subsequently proofs were taken in the cause, the testimony which was very voluminous being closed June 4th, 1896, and it was finally brought to a hearing before me.

It appears from the evidence on the part of the respondent, and it is not denied by the complainant, that defalcations were committed by Smith as paying teller during a series of many years. They began several years prior to November 1st, 1879, the time when the first bond on which the complainant became a surety was given, and continued until Smith's detection and resignation in February, 1893, when he made a full confession, and was indicted, tried and sentenced to a term of imprisonment. During the whole period money was constantly abstracted by Smith at the rate of several thoussand dollars a year. The complainant would only be liable under the first bond for such defalcation as might be committed between its date, the 1st day of November, 1879, and the 5th day of July, 1885, and under the second bond for such as might be committed between its date, the 6th day of July, 1885, and the 5th day of July, 1891, when a new bond was given by Smith with the American Surety Company as surety. Smith's defalcations between the first day of November, 1879, and the 5th day of July, 1885, appear from the evidence to amount to the sum of $11,650, and between the 6th

day of July, 1885, and the 5th day of July, 1891, to have been $27,750.

Much, in fact most of the testimony both documentary and oral, relates to the method by which Smith succeeded in abstracting such large sums of money and in concealing so successfully their embezzlement, or it discloses in detail the workings of the bank during the period covered by the bonds in controversy and prior thereto, the system of bookkeeping employed and of the checks upon the employes used and the diligence displayed by the president and directors in preventing or disclosing fraud or dishonesty on the part of such employees.

Complainant alleges in his bill that the bank "wholly failed and omitted to use proper care and reasonable diligence in the management of the affairs of said bank, and but for such negilgence and omission the alleged embezzlement would not have occurred," and also that Smith "was required and suffered to perform the duties of a bookkeeper in said bank, and that the duties imposed upon him as bookkeeper were not appropriate to his employment as paying teller, nor within the terms of said bond, and that his embezzlement, if any, of the money and funds of said bank were connected with and in use by reason of his employment in said bank as bookkeeper."

With regard to the last allegation it may be stated here that it appears from the evidence that the bookkeeping referred to, consisted in the fact that it was made a part of Smith's duty to keep the Individual Deposit Ledger, and it also appears that it was the custom at that time of the great majority of the banks in this State to impose this duty upon the paying teller, and that it was considered by those banks to be a legitimate part of the duties of the paying teller.

As to the whole question, however, of negligence on the part of the officers of the bank,—although it may be proper for me to state that a careful examination of the evidence adduced has satisfied me that the degree of care and diligence displayed by them was such as is to be found in similar moneyed institutions, neither more nor less,—yet I shall omit the

discussion of the evidence on that point as being unnecessary to the decision of this cause, in view of the well settled principle that such negligence does not discharge the sureties in such official bonds as those which are the subject matter of this suit.

The grounds upon which this principle rests were long ago stated with force and precision by Chief Justice Shaw in the case of *Amherst Bank vs. Root and others*, 2 *Metc.* 540, and I will quote from his language at length. He says:.

"Another ground of argument for the defendant was that the sureties were not liable by reason of the culpable negligence of the directors and their agents, inasmuch as the by-laws of the bank made it the duty of the directors to make frequent examinations of the affairs of the bank, to count the money, to inspect the books, and generally to watch over its concerns; and it is contended that it does not appear from an inspection of the minutes of the directors that this was done. Whether their duties were as diligently done as they ought to have been, we do not inquire because it appears to us that the by-laws were directory, intended to prescribe the duties of the directors; and though the performance of them might tend to detect and disclose negligence, or lead to an early disclosure or detection of default on the part of officer, and so operate indirectly to the safety of the sureties; yet they were not intended for that purpose, nor can a compliance with them be deemed a condition precedent to the liability of the sureties. But further, the adoption of such a principle would lead to this result, that the negligence and fault of one agent, or set of agents, for a corporation, would deprive them of a remedy against another for their default. As well might the directors excuse themselves for the neglect of their duty, by showing that the cashier had failed to lay before them the books or accounts, the weekly or other statements of the affairs of the bank, by reason of which they were unable to perform their duty.

"The idea that the cashier is excused by the act or negligence of the directors, arises from considering the board of directors as the corporation, and then applying a very equitable principle, that one ought not to recover of a surety damages

caused by himself. We think the principle does not apply. The only case which seems to countenance it is the *People vs. Jansen*, 7 *Johns.* 332; a case which has been often questioned and which we think is fully answered by the cases of *United States vs. Kirkpatrick*, 9 *Wheat.* 720, and *Minor vs. Mechanics' Bank of Alexandria*, 1 *Peters*, 46."

Again in *Tapley vs. Martin*, 116 *Mass.* 275, in the same court, where a defaulting bookkeeper had been elected cashier and the suit arose in consequence of his defalcations as cashier, it was alleged that the directors had been guilty of negligence in not having discovered his defalcation as bookkeeper committed before the bond as cashier was given, Morton, J., said: "Upon examining the evidence reported in the bill of exceptions, it is clear that there is no evidence which would justify the jury in finding that the officers of the bank had actual knowledge of Martin's frauds while he was bookkeeper. We are not, therefore, called upon to decide whether if they had such knowledge and failed to communicate it to the sureties on Martin's bond as cashier, the bond would be thereby avoided as to the sureties. The only question is whether their negligence in failing to examine the books discharges the obligations of the sureties. We can see no principle upon which it could be held to have this effect. The object of the bond is to guarantee to the bank the faithful performance by the cashier of his duties. His duties and obligations are not affected by the negligence of the other officers or agents of the bank and such negligence does not discharge his sureties." Then after quoting from the opinion of Chief Justice Shaw in *Amherst Bank vs. Root*, which I have quoted above, he proceeds as follows:

"In the case at bar the plaintiff was not induced to sign the bond by any fraud of the directors and the Court correctly ruled that he would not be released from his obligations as surety by their alleged negligence in failing to examine the books and affairs of the bank. *Minor vs. Mechanics' Bank of Alexandria*, 1 *Pet.* 46; *United States vs. Kirkpatrick*, 9 *Wheat.* 72; *Franklin Bank vs. Stevens*, 39 *Me.* 532; *Farmington vs. Stanley*, 60 *Me.* 472."

The case of *Wayne vs. Commercial National Bank*, 52 *Pa. St.* 343, is a case where the teller of a bank was a defaulter to it at the time the sureties entered into a new bond for the faithful performance of his duties, &c., and on this ground the sureties sought to be relieved, alleging negligence on the part of the directors. The opinion of the Court is to the same effect as in the Massachusetts case and is full and emphatic.

In a late Federal case, *Phillips vs. Brossard*, 35 *Fed. Rep.* 100, Simonton, J., says: "Second. That the wilful negligence and misconduct of the president and board of directors permitted the fraudulent acts of Bartlett, and the sureties consequently are not liable therefor. Assuming that the validity of the bond at its execution is not disputed, no evidence to this effect having been shown, I charge you that this defence, even if it be fully made out cannot avail the defendant. The bond of Bartlett, signed by the defendants, was given to the National Bank of Sumpter, not to the president nor to the board of directors. If he committed the defalcation by the frauds charged, neither he nor his sureties can be excused because of any negligence or omission of duty on the part of the president or board of directors."

This principle is emphatically laid down in the leading case upon this subject in our own State, *Sparks et al. vs. Farmers' Bank*, 3 *Del. Ch.* 302, and it would be superfluous for me to cite further. Indeed the learned counsel does not dispute this principle, apparently, in its application to subsequent frauds, but in his extremely elaborate and learned argument, rests the claim of the complainants to be released from his obligation of suretyship solely upon the two distinct grounds which he states in the following language in his brief:

"First. That the bonds signed by Lieberman are void as to him because he became surety thereon by the fraudulent representations of the respondent.

"Second. That the right of the First National Bank to proceed on the said bond is barred by the statute of limitation."

The facts alleged by the complainant in support of the first proposition are first, that Mr. Lieberman, the complain-

ant, prior to signing each bond, made inquiry of George D. Armstrong, cashier of the bank, with regard to Smith's accounts and character, and was each time assured by Armstrong that Smith's accounts were all straight and that he could go on his bond with safety.

This allegation requires but little consideration as a ground for relief, inasmuch as no statements made by the cashier, a fellow employee of Smith, could in any way affect the responsibility of a surety—the cashier having no more authority to represent the corporation respondent in such a matter than any clerk or bookkeeper in the employ of the association.

The second fact alleged in support of the first proposition is the one upon which complainant manifestly relies, so far as his first ground for relief is concerned, and requires careful consideration.

In order to understand clearly this point it is necessary to cite *section* 5211 of the *U. S. Revised Statutes*, under the title "National Banks," which provides as follows: "Every association shall make to the Comptroller of the Currency not less than five reports during each year, according to the form which may be prescribed by him, verified by the oath or affirmation of the president or cashier of such association, and attested by the signature of at least three of the directors. Each such report shall exhibit, in detail and under appropriate heads, the resources and liabilities of the association at the close of business on any past day by him specified; and shall be transmitted to the Comptroller within five days after the receipt of a request or requisition therefor from him, and in the same form in which it is made to the Comptroller shall be published in a newspaper published in the place where such association is established, or if there is no newspaper published in the place then in the one published nearest thereto in the same county, at the expense of the association; and such proof of publication shall be furnished as may be required by the Comptroller. The Comptroller shall also have power to call for special reports from any particular associa-

tion whenever in his judgment the same are necessary, in order to a full and complete knowledge of its condition."

The reports required by the statutes were regularly made and published in the *Every Evening* a newspaper in the City of Wilmington, and it is in evidence, were always read by the complainant, who was a depositor in the said The First National Bank, and the complainant further testifies, page 20 of the testimony, in reply to the following question:

"I will ask you, whether it was from these published statements and from what Mr. Armstrong said to you that you were induced to go on the bond in 1885?"

"It certainly was. If I had seen that the bank's published account did not show it in good standing I certainly would not have gone on his bond a second time."

Again on page 21 he answers the same question as to the bond of 1879 in the affirmative; and on page 27 of the testimony, when asked on cross-examination what he found out in regard to the bank from that statement he replied: "I found that the bank was in a good, healthy condition."

This is all the evidence before me tending to show in any way that the representations contained in these reports had any effect in inducing the complainant to become a surety on Smith's bond.

These reports contained, as we have seen, a statement of the resources and liabilities of the respondent, as shown by the books of the bank, and those books being incorrect to the extent of Smith's falsification of them, the reports therefore stated incorrectly to that extent, the resources and liabilities of the respondent.

The complainant testifies positively that he never made any inquiries as to the condition of the bank, or of Smith's account, other than those made of Armstrong above referred to, and never requested that any special examination of his accounts or of the accounts of the bank should be made. These reports, therefore, constitute the only representation made by the directors or any of them bearing any relation to the bank or its business, of which the complainant had any

knowledge, and constitute the alleged fraudulent representations.

No question is raised as to the good faith of the directors or any other officer of the bank, and it is not suggested by the complainant that they had any knowledge or suspicion of Smith's defalcation prior to or during the time covered by the bond in which complainant was a surety. In fact, it is evident from the whole testimony, that Smith was a favored and trusted employee of the bank, and nothing in his conduct to excite suspicion had been brought to the attention of any of the directors until after the period covered by complainant's bonds.

The only question, therefore, for me to consider in this connection, is whether the incorrectness of these reports which are shown to have been read and weighed by the complainant in the manner described in his testimony, which I have quoted, operated to discharge him from his obligation as surety.

The learned counsel for the complainant cites from Mr. Bigelow the principle, that a false representation may be made *scienter*, if made by one of the parties to a contract, either without knowledge of its truth or falsity, or under circumstances in which the person making it ought to have known its falsity. 1 *Bigelow, Fraud* 509. And he cites at length a great number of cases setting aside or rescinding contracts obtained by material false representations, or sustaining actions brought by depositors against the individual directors of insolvent banks, whose false statements of the solvency of their banks, although made without knowledge, had induced such depositors to continue or become such.

All this is unquestionably sound law, and so is another proposition cited by complainant's counsel, from 1 *Bigelow on Frauds*, 411: "The general rule in equity is that any contract of however solemn character, may within certain limits be rescinded for constructive and *a fortiori* for actual fraud; or to state the matter with reference to the title of this section, any contract may be rescinded for innocent misrepresentation, which was sufficient inducement thereto."

The last phrase is an essential element of the proposition and is the essential fact, existing in every case cited by the learned counsel. The misrepresentations, in every case cited, were sufficient inducement to the contract. And whereever these equitable principles are fully stated, or whatever the case may be in which they are applied, whether it be in a suit for the specific performance of a contract, or for the rescission of a contract, or for the discharge of a surety from the obligation of his contract of suretyship, it is either expressly stated or necessarily implied that the misrepresentations are such as to be sufficient inducement to the contract. And furthermore there must be such a connection between the nature of the representations and the nature of the contract that the person making the representations might reasonably infer that they would constitute an inducement to enter into the contract. This seems to me to be too obvious as a general proposition to require elaboration.

Now let us apply this principle to the facts of this case, and let it be taken for granted for that purpose that these reports made by the directors in the manner described must be taken to have been made by the corporation respondent. I will again repeat that the reports were required by the statute to contain, and did contain, an exhibit "in detail, and under appropriate heads of the resources and liabilities of the association at the close of business on a past day by the comptroller specified," and that they contained nothing else; and also that they were in fact incorrect to the extent of Smith's defalcation, although believed to be correct when made.

It is obvious that the object of the publication of such statements was to inform stockholders and depositors and all those who might intend to become stockholders or depositors, or who might in any manner entrust their money to the bank, of its financial condition. For this purpose, whatever statements may be contained in these reports might be sufficient inducement to act, and the directors might reasonably infer that they would be relied upon, and constitute such an inducement. But would any reasonable man infer that

they would operate as an inducement to any one to become surety on the bond of an employee of the bank, and could be so construed as to make the validity of the bond depend upon their correctness? Would any reasonable man look to those reports for information as to the former fidelity of an employee of a bank, with a view to ascertaining whether he could become with safety a surety on his official bond for the faithful performance of his duties? In short, do the statements contained in these reports go to the subject matter of a contract of suretyship? I think not.

The learned counsel for complainant has presented a single case, *Graves vs. Lebanon National Bank*, 10 *Bush* (*Ky.*) 23, which held that the sureties in an official bond were released by the incorrectness of such a bank report. But that case stands absolutely alone and unsupported, and therefore I will not stop to analyze it, although I am disposed to think that the suspicions evidently entertained by the learned judge as to the bad faith of some of the directors involved in that case might have influenced somewhat his decision. That case is cited and vigorously opposed in a New Hampshire case, *Ashuelot Savings Bank vs. Albee*, 63 *N. H.* 161, 163, and I will quote at some length from the vigorous opinion of the Court delivered by Chief Justice Doe:

"The law required that a thorough examination of the plaintiff's affairs should be made by the trustees or by a committee of trustees, once in every six months; that a report of such examination signed by a committee of the trustees should be returned to the bank commissioners; that a copy of the report should be published by the plaintiff in a newspaper; and that proper blanks for these examinations should be furnished to the plaintiffs by the bank commissioners, *G. L., c .*170, *ss.* 2, 3, 4.

"These duties were performed with an exception by which the examination, reports and publications were rendered useless. The committee erroneously believed their examinations were thorough. By their superficial inspection the annual defalcation was not discovered. They acted in good faith, and according to their understanding of their

duty; but as frequently happens in such business, confidence in the treasurer, and lack of special detective skill, made the examiners incompetent for the task assigned them. The case is not an exceptional instance but the operation of a general system. Many trust funds, private and public, need the service (obtainable for an adequate compensation, under the law of demand and supply) of investigators, not only mentally and morally sound, but also trustworthy as experts, laborious, capable of inquisition, and not disqualified by confidence in any body.* * * * * *

"The committee's duty of diligent examination and truthful report was not due to persons considering the question of becoming sureties of the treasurer. It was a duty imposed by statute for the benefit of depositors and not to enable a reader of the public reports to determine whether the treasurer was a man whose official bond he could safely sign. Publications ordered by the Legislature for the protection of the depositors, the defendants seek to employ in depriving the depositors of protection. If the defendants had been induced by the reports to make deposits in the bank, they might have claimed that they were of a class whom the reports were intended to influence. The publication was for the information of the public, and to supply all of the evidence which they might consider on the question of taking certain action. But the question of becoming a surety of the treasurer, was not one for the decision of which the law compelled the reports to be made public, as evidence furnished by the plaintiffs, with the consequence of subjecting the trust fund to a great risk of losing the security of the bond. Whatever authority it might be claimed any of the plaintiff's officers or managers had to accomplish or defeat, the purpose of the statutory trust by performing the duty of publishing the result of the committee's examinations, the duty of publication was not imposed to aid the treasurer in obtaining sureties, or to clothe any one with the power of nullifying the statutory requirement of a bond. The doctrine of *Graves vs. Lebanon National Bank*, 10 *Bush*, 23, cannot be accepted as a discharge of these sureties without unreasonably imputing to the Legislature an

implied intention to expose the savings of depositors to unnecessary and unjust peril by authorizing the protective bond required by s. 7 of c. 170, Gen. Laws, to be destroyed by the protective publication required by s. 2 of the same chapter. There is no evidence that the reports were published or were understood to be published, with any other object than the execution of the legislative command, the purpose of which did not establish between these parties the privity of representation necessary for this defence."

The reasoning of the New Hampshire Court seems to me to apply with equal force to the facts in this case; and, after the careful consideration I have given to the authorities and principles applicable to the plain facts of this case, I am clearly of the opinion that the complainant is not discharged from the obligation of his contract of suretyship by reason of the incorrectness of the published reports of the financial condition of the respondent. To hold the contrary would be to establish a precedent unwarranted by principle or authority, and tending to produce disastrous confusion and uncertainty in the most important business relations.

The second and only remaining ground upon which the complainant claims relief through the interposition of this Court, is the bar of the Statute of Limitations. The language of our statute is as follows: "Section 11. No action should be brought upon any bond given to the president, directors and company of any bank, or to any corporation, by any officer of such bank or corporation, with condition for his good behavior or for the faithful discharge of the duties of his station, or touching the execution of his office, against either the principal or sureties, after the expiration of two years from the accruing of the cause of such action; and no action shall be brought, and no proceedings shall be had upon any such bond, or upon any judgment thereon against either the principal or sureties, for any cause of action accruing after the expiration of six years from the date of such bond." *Rev. Code* (1893) 889, *ch.* 123, *sec.* 11.

The defalcations under each of the bonds accrued within six years from the date of the bond, and therefore the second

clause is inapplicable, and we are only concerned with the first clause, which provides that no action shall be brought against either principal or sureties after the expiration of two years from the accruing of the cause of such action.

It was long ago settled in this State that a warrant of attorney to confess judgment, such as we have in the case under consideration, does not take the case out of the statute. This was one of the points decided by our Court of Errors and Appeals in the well-known case of *Whittaker et al. vs. Parker, State Treasurer,* a case which was argued by some of the ablest counsel then at our Bar, and which appears in our reports three several times—once as reported from the Superior Court, 2 *Harring.* 136, and twice from the Court of Errors and Appeals, 2 *Id.* 413, and 4 *Id.* 527, Chief Justice John M. Clayton delivering the opinion of the Court which finally disposed of the case.

So far as this case applies, it, of course, controls absolutely the decisions of the Court of Chancery, and I shall therefore review it at length since it settles certain principles necessarily involved in the decision of this case.

It was a case where judgment *d. s. b.* was confessed under a warrant of attorney, annexed to the bond dated October 3, 1835, on the official bond of Whittaker as Collector of State taxes, and others, his sureties. The bond was dated May 2, 1831, and the act of limitation directed that no action should "be brought upon the official obligation of any collector after the expiration of three years from the accruing of the cause of such action."

The case was heard in the Court below on a rule to show cause why the judgment should not be stricken off, having been entered after the bond was barred by the Statute of Limitation. The ground upon which the State relied to take the case out of the Statute was a new promise made by Whittaker by letter. It was also claimed by the counsel for the State that the warrant of attorney to confess judgment took the case out of the Statute, whilst on the other hand the opposing counsel contended that such an entry of judgment was

absolutely void, because the limitation had run at the time of entry.

Chief Justice Clayton entirely disposed of both of these contentions. Of the one he said: "We do not rest the case on any supposed effect of a mere warrant of attorney as taking the case out of the Statute." Of the other he remarked, "Nothing could be more erroneous than to suppose that such an entry of judgment was absolutely void, because the limitation had run at the time. To establish such a principle would be virtually to overrule all the leading decisions governing these statutes, which are held to be *in pari materia* and demanding the same general rule of construction. The Statute of Limitation admits the cause of action or consideration of the action still existing, and merely discharges the defendant from the remedy, so that a new promise without any other consideration, is sufficient to revive or restore the action therefore, if the defendant will take advantage of that circumstance, it is necessary he should plead the Statute. *Hodson vs. Harridge*, 2 *Saund. Rep.* 63, a. n. 2.."

He further says, "The State is not excluded from the opportunity of entering its judgments, merely because the time prescribed by the Statute has run. It is not to be taken for granted that the public defaulter will plead the Statute." And the subject of entry of judgment under warrant of attorney was then clarified by the Chief Justice as follows: "Stress was laid, in the argument, upon the express words of the Statute 'no suit 'shall be brought upon any collector's bond after three years from the accruing of the cause of the action;' and it was very properly said by the defendant's counsel that this was a suit on the bond. It was a suit commenced without writ, by virtue of the warrant of attorney, the defendant voluntarily appearing to the plaintiff's declaration and confessing the judgment in that suit. But the language of this part of the statute is precisely the same with that of other parts, which have always received the same judicial construction, and that is that suits may be commenced, although the time fixed by the statute for it has expired, and although the very record itself discloses that fact. For the

law will not presume either that the defendant is entitled to plead it or that if so entitled he will plead it." 4 *Harring.* 527.

There is more to the same effect, but I have cited the case sufficiently to show fully the reasoning of Chief Justice Clayton, as well as the propositions he so distinctly laid down.

This brings me to the consideration of the only two decisions in the Court of Chancery in this State, which bear at all upon the point under consideration,—the decisions to which we must look in order to ascertain whether the question is to be considered as already settled and determined so far as this Court is concerned, or whether it is still to be discussed and determined as an open question.

The first case is that of *Sparks et al. vs. Farmers' Bank*, 3 *Del. Ch.* 275, decided by Chancellor Bates in 1869, ten years prior to the date of the first bond in this cause. Like the cause under consideration, it was a bill  in equity by the sureties in the official bonds of a defaulting bank officer, to restrain the bank from proceeding at law to collect from complainants the amount of certain alleged defalcations of Heston, their principal, committed while cashier of the Farmers' Bank at Wilmington.

I have already cited this case in discussing another question. I shall consider it now solely in relation to the bar of the Statute of Limitation. The Hon. Thomas F. Bayard was counsel for the complainants, the Hon. Anthony Higgins and the late Judge Bradford were counsel for the bank. Chancellor Bates says: "There remains a third and last ground of relief taken for the sureties—that is, that under the statute barring suits on official bonds after two years from the accruing of the cause of action, the sureties are discharged as to so much of the defalcation as occurred more than two years previous to the entering of judgment on the bond, which was in March, 1867."

After giving the dates and amounts of the checks representing the defalcation, and referring to the point raised on the argument, that the defaulting cashier's failure to pay when his defalcation was discovered, constituted a new defalcation, the Chancellor says: "It is not necessary to decide

that question; for even supposing the abstraction of $3,046.46 on December 1st, 1864, to be the only breach of the bond as to that sum, still the bank is entitled to collect it. Their equity to do so arises out of the fact that the defalcation was a fraud concealed from the bank with respect to which a court of equity will not permit the statutory bar to be set up until the lapse of the prescribed term after the discovery of the fraud.

"It is a settled and familiar principle that a court of equity will not permit a party to make an unconscientious use of an advantage gained at law, hence it will deprive him of defences when set up to protect fraud, though such defences be founded upon the most positive statutory enactment."

Then, after citing and discussing a number of authorities, the learned Chancellor thus concludes: "There is nothing in the present case to except it from the operation of the rule. It is true that equity will not relieve against the bar of the Statute in favor of a party who has been in *laches* in not using means within his power to discover the fraud. But a close supervision by large moneyed corporations over their officers, sufficient to insure the speedy detection of fraud is not practicable, and if it were so would become intolerable. These institutions must unavoidably trust their officers and rest upon the official bond as the guaranty for their fidelity. It is to this end that the bonds are taken. Their value would be destroyed and their purpose defeated were it in the power of a shrewd cashier to absolve himself and his sureties by covering up his frauds for two years.

"If the rules applied to this case seem to bear hardly upon the sureties, it must be remembered that by their bond they undertook for the cashier's fidelity absolutely and at all events, and engaged unconditionally to make good his default. They had the power to limit their responsibility expressly to one year, or to make it subject to any conditions which might be agreed upon, but this was not done.

"It would be a prudent practice and one best securing all parties, that the obligation of such bonds be expressly limited to one year, and that upon the giving of a new bond

by an officer re-elected, an examination be made sufficient to test his integrity at that time."

This case, it will be observed, is the exact counterpart so far as the applicability of the bar of Statute of Limitation is concerned to the case under consideration, for it can make no difference in principle that the period of successful concealment in the present case is much longer and the consequent loss much greater.

The second decision to which I refer, is that of Chancellor Saulsbury in the case of *Grimshaw vs. Mayor and Council of Wilmington*, 5 *Del. Ch.* 183. This was a bill in equity by one of the sureties in the official bonds of Joseph L. Killgore, a defaulting city treasurer, to restrain the city from further proceedings at law to collect from complainant the amount of certain alleged defalcations committed by Killgore, his principal, while City Treasurer of Wilmington. The reported case contains in the statement of facts the following: "The act of the General Assembly of this State in respect to the entry of judgments on the official bond of the City Treasurer of the City of Wilmington, provides that judgment on said bond shall not be entered after two years from the expiration of his term of office."

The Chancellor says in his opinion: "I shall not enter into a general discussion of the principle applicable to a case where a concealment of fraud has been proved to exist on the part of the defendant in a suit brought against him after the discovery of the fraud has been made, but not within the period mentioned in the Statute in that respect, to make him account for the amount of said fraud, because I am of the opinion that the principles adjudged in cases of that kind, where the statutory limitation has been pleaded as bar to the cause of action, are not applicable to the case before me.

"It is true, as contended by the solicitors of the City Council of Wilmington, that where one person defrauds another of his just rights, and the fraud is concealed at the time of its commission and not discovered within the period embraced by the Statute of Limitation, the party defrauded has a right to bring his action for the recovery of the amount of

which he has been defrauded, at any time within the proper legal period for bringing actions.

"This principle does not apply to the present case. The judgments mentioned in these proceedings were not entered within the period prescribed by law. They were therefore nullities. The judgments themselves being absolutely void, and the entry thereof being absolutely prohibited by an act of the General Assembly, the several executions issued upon them cannot have any possible legal effect.

"The sheriff could not justify any act done under them. The complainant might lawfully resist their execution; and he certainly has, as a surety, the right to avail himself of their illegality in an attempt to enforce, as against him as surety for Killgore, a claim for the amount of Killgore's defalcation in office, even if such defalcations were proved to exist."

A decree was made by the Chancellor refusing the prayer of the bill in so far as it prayed a permanent injunction against further proceedings on the execution in the case, and dissolving the preliminary injunction that had been issued, with direction to the complainant to apply to the Superior Court for a rule upon the plaintiff in said judgment to show cause why judgment 594 to Nov. T, 1874, in said Superior Court should not be set aside, annulled and vacated.

Subsequently, upon the petition of Grimshaw to the Superior Court, a rule issued to show cause why the said judgment should not be set aside, annulled and vacated; and by consent of all parties, all matters and controversies were referred to the Hon. Edward G. Bradford to be heard and determined; and in accordance with the report, which was accompanied by a long and interesting opinion, the rule was made absolute.

It is manifest from this examination that nothing can be found in this case to affect the authority of *Sparks vs. Farmers' Bank, supra*, as decisive of the point under consideration. To repeat a quotation already made, Chancellor Bates said in that case the equity of the bank to collect "arises out of the fact that the defalcation was a fraud concealed from the bank, with respect to which a court of equity will

not permit the statutory bar to be set up until the lapse of the prescribed time after discovery;'' whilst Chancellor Sauls-bury says in *Grimshaw vs. Wilmington, supra,* "It is true, as contended by the solicitors of the City Council of Wilmington, that when one person defrauds another of his just rights and the fraud is concealed at the time of its commission, and not discovered within the period embraced by the Statute of Limitation, the party defrauded has a right to bring his ac-tion for the recovery of the amount of which he has been de-frauded, at any time within the proper legal period for bring-ing action.''

It is unnecessary to comment at all upon that part of the learned Chancellor's opinion, in which he stated that the judgment entered in the Grimshaw case was absolutely void, inasmuch as I have already shown that our Court of Errors and Appeals, in *Whittaker vs. Parker, State Treasurer, supra,* has expressly passed upon the status of such judgments as those which are the subject matter of this suit.

I cannot, therefore, sustain the contention of the learned counsel for complainant that this Court should permit the statutory bar to be set up by a surety, if not by his principal, before the lapse of the prescribed term after the discovery of the fraud which constituted the breach of his bond. Such a contention is not now open to discussion in this Court. The question, as has been pointed out, was distinctly, clearly, and unequivocally decided by this Court nearly thirty years ago and the authority of that decision has not been questioned since.

An independent discussion by me would necessarily in-volve a lengthy consideration and analysis of a long series of authorities upon the general subject, and would necessarily im-ply upon my part a disregard of the doctrine of *stare decisis* as applied to the carefully considered decisions of this Court, which would be in my judgment of doubtful propriety, if not practically injurious to the authority of the decisions of the Court of Chancery.

The situation of the complainant is a hard one, the loss and annoyance brought upon him by the dishonesty of the

defaulting teller whose honesty he guaranteed, must command sympathy, especially in view of the long series of years during which, by abusing the confidence reposed in him, the dishonest official so enormously increased the magnitude of that loss.

Such losses, however, are unhappily matters of daily occurrence, and in this case I cannot refrain from referring again to the concluding words of the opinion of Chancellor Bates, which I have already quoted, and which were intended to serve as words of warning to prevent the occurrence of just such cases as this, and were uttered ten years before the complainant entered into the contract of suretyship from the disastrous consequences of which he now seeks to be relieved by the active interposition of the Court of Chancery.

The prayers of the bill are denied and a decree will be entered dissolving the injunction, so far as to allow the bank to collect the amount of the defalcation proved, and covered by the complainant's bonds, with interest.

---

The Question as to the Form of Decree.

---

THE QUESTION AS TO THE FORM OF DECREE:—Shortly after the delivery of the foregoing opinion, counsel for the respondent submitted a form of decree, following that of Chancellor Bates in *Sparks vs. Farmers' Bank*,

To this, counsel for the complainants objected, in respect to the allowance of interest on the several defalcations covered by the bond, and the collection of interest on the judgment entered under warrant of attorney, from the date thereof. Argument was had and briefs were filed, including several supplementary briefs in reply and rejoinder. Argument of counsel may be summed up, as follows:

*L. C. Vandegrift*, for respondent.

Obligors in a bond given by an officer for faithful performance of official duties are liable thereon to reimburse the obligee for all loss sustained by the defalcation of the officer.

Each abstraction was a breach for which the obligors were liable with interest from its date. In a suit on the bond, the judgment would have been for the aggregate amount with interest on each item to the date of the verdict.

On the first bond the aggregate amount of the defalcations between its date June 1, 1879, and July 6, 1885, (the date of the second bond) exclusive of interest was $11,650. If interest on each item from its date to the date of the judgment is added to the aggregate of the sums abstracted, the total sum would exceed the penalty of the bond. So the judgment was taken only for the amount of the bond.

In ascertaining the defalcations under the first bond, the dates of almost all the abstractions were proved. But it appears that several sums were abstracted between June 1, 1879, and July 6, 1885, the exact dates of each abstraction not being known, the aggregate being proved to be $520. Interest therefore would be calculated on this $520 from July 6, 1885, the last date upon which they could have been abstracted.

As to the second bond, dated July 6, 1885, the total amount of the sums abstracted while this bond was in force was $27,750, exclusive of interest, and it is also unnecessary

to consider whether the liability of the obligors extended beyond the amount of the bond, for judgment was entered for the penalty of the bond, $15,000. Interest on this judgment is surely collectible.

The theory upon which the decree was framed, is supported by authority.

Interest on moneys abstracted by an officer of a bank is due from the time each sum is abstracted, and may be recovered in an action on the official bond against principal and sureties. *Murfree on Official Bonds sec.* 326; *Sedg., Dam. sec.* 303; *Supervisors vs. Clark,* 92 *N. Y.* 391; *Supervisors vs. Birdsell,* 4 *Wend.* 453; *Wyman vs. Robinson,* 73 *Me.* 384.

In the cases cited from New York, interest was allowed from the time the officer should have paid over the amounts received by him officially; that is, from the dates of certain settlements.

But in this case, Smith, the teller, abstracted sums of money by false entries, &c., which he did not have a right to take or retain for any length of time. So that interest is due on each item from the date he took it.

Each abstraction was a breach of the condition of his bond, and interest on the sum abstracted from the time of abstraction is allowable to the Bank.

Interest is always allowable on money ilegally obtained or detained from the date obtained or detained.

The draft of the decree submitted follows the form of decree entered in a similar case in Chancery in this County, *Sparks vs. Farmers' Bank, supra.*

Following the above rule and allowing interest on each sum abstracted from the time abstracted, it appears by calculation that on the bond dated June 1, 1879, the aggregate of the several sums abstracted with interest thereon severally from the time of abstraction to the date of entry of judgment on the bond, exceeded the penalty of that bond.

It is unnecessary to consider whether in suit on the bond, judgment could have been recovered for more than the penalty of the bond, for judgment was entered by the warrant of attorney for the amount of the penalty only; and the

plaintiff in that judgment cannot collect by execution more than the judgment, and costs. There are authorities which would have allowed recovery for an amount larger than the penalty as damages for detention. *Wyman vs. Robinson, supra.*

The sole question remaining for discussion is whether the plaintiff is entitled to interest on the judgment from the time of the entry thereof.

This is easily answered in the affirmative, for the entry of judgment by warrant of attorney is of the same effect as if suit had been brought on the bond and judgment recovered in that suit. It is no objection that it would be allowing interest on interest, for this always happens when judgment has been recovered for a principal sum with interest to the date of verdict or judgment. Interest is damages for detention and becomes necessarily a part of the judgment. In a suit on a note, bond for the payment of money, &c., interest is always added to the principal in fixing the judgment. *McClure vs. Dunkin*, 1 *East* 436.

There is no difference in the liability of principal and sureties on an official bond. *Harris vs. Clapp*, 1 *Mass.* 308; *Wyman vs. Robinson, supra.*

In the federal cases cited for complainant on the point now under consideration, *United States vs. Poulson* and *United States vs. Curtis*, there was no evidence of the time of actual conversion and no proof of demand until suit.

This is the distinction which shows that the line of authorities cited by complainant does not touch the point in issue, and it was fully recognized in *United States vs. Denvir*, 106 *U. S.* 536; *United States vs. Knowles*, 106 *U. S.* 537, *note.*

The true rule is that, "Interest should be allowed from the date of embezzlements, or from the end of each year, if the jury or Chancellor choose, * * * up to the penalty of the bond, but not beyond it of course." *Guarantee Co. vs. Bank*, 80 *Fed. Rep.* 766, 785; and no valid argument can be advanced against the allowance of interest on the judgments from the date of their entry.

*B. Nields*, for complainant, insisted that no well adjudicated case can be found where sureties have been held liable for interest before notice of breach.

There is a well defined and clear distinction made in the cases between the liability of the principal debtor for interest on money fraudulently abstracted and the liability of his sureties for interest from the time of such abstraction. The latter cannot be held liable for interest beyond the penalty of the bond, except for such interest as accrued from their own default in unjustly withholding payment after having been notified of the default of their principal. *Murfree on Official Bonds sec.* 689; *McGill vs. Bank of U. S.* 12 *Wheat.* 511; *s. c.* 1 *Paine C. C.* 670; *Washington Bank vs. Shurtleff*, 4 *Metc.* 30.

The surety's liability for interest accrues,

(1) Either after proper demand on the principal and his refusal to pay; or

(2) From the commencement of the suit, in which latter case interest accrues from the day of service. 1 *Brandt. Sur. G. sec.* 112; *United States vs. Poulson*, 30 *Fed. Rep.* 231; *United States vs. Curtis*, 100 *U. S.* 119.

In the cases of *United States vs. Denvir* and *United States vs. Knowles*, cited on the other side, the fact of conversion did not appear and the Court held simply that the surety was liable for interest from the service of the writ; anything more in the opinion is *obiter*.

*Sedg., Dam. sec.* 303, cited on complainant's brief, has no application whatever to the liability of sureties for the payment of interest before notice of breach. The case of *Wyman vs. Robinson*, 73 *Me.* 384, cited on complainant's brief, was an action upon a replevin bond against principal and sureties, and the Court allowed interest from the date of the judgment against the principal in the original action; that being the date of the breach of the bond, and the judgment recovered was notice to the sureties. The case of *Supervisors vs. Birdsell*, 4 *Wend.* 453, was a case against a County Treasurer, and the question of liability of sureties for interest before notice of breach, is not considered. The case of *Supervisors*

*vs. Clark*, 92 *N. Y.* 393, is founded on the case in 4 *Wend.* 453, and is not a case where liability of sureties for interest before notice of breach was considered by the Court.

We also contend that in any event interest should not be allowed on the penalty in either bond from the date of the judgment, but only from the date of the decree to be entered in this Court, since the amount to be collected is then first ascertained.

In the case of *Sparks vs. Farmers' Bank*, the question of interest was not discussed or referred to by counsel on either side and no argument was heard on the form of decree.

THE CHANCELLOR—

It is now six months since this cause was formally decided by me, and my reasons for holding the sureties liable given at length in an opinion which was read and filed June 1st. The concluding paragraph of that opinion was as follows:

"The prayers of the bill are denied and a decree will be entered dissolving the injunction, so far as to allow the bank to collect the amount of the defalcations proved and covered by complainant's bonds, with interest."

I deemed this to be a sufficiently clear direction for the preparation of a decree, following closely the form of decree made by Chancellor Bates in *Sparks vs. Farmers' Bank*, in accordance with the opinion delivered by him in that case, the concluding paragraph of which is as follows:

"A decree will be entered dissolving the injunction so far as to allow the bank to collect the amount of the defalcation proved, with interest."

The decree in the Sparks' case, in the Chancellor's own hand writing, is on file with the other papers in that cause, and was used by Mr. Vandegrift, counsel for the bank, in preparing the form of decree submitted by him, but this was objected to by Mr. Nields, counsel for the complainant, in two important particulars; and inasmuch as counsel laid much stress on the fact that no argument was heard on

the form of decree in the Sparks case, I have given all the time desired for argument on the decree in this cause, and the preparation of supplementary briefs. The points discussed concern the principles upon which interest is collectible from the sureties, amounting to thousands .of dollars, so that their decision is of vital importance to the parties in this cause, although debated as on the form of the decree only.

After patient investigation and careful consideration, I have been unable to arrive at any other conclusion than that the decree proposed by counsel for the respondent is correct in every particular, and that the contentions of complainant's solicitor are neither correct in principle nor supported by authority.

The complainant filed his bill in order to be relieved from paying to the bank any of the defalcations of Peter T. E. Smith, the paying teller, which constituted the breaches of the condition in each of the bonds, upon which judgment for the penalty ($15,000.00 in each case) was entered Februarly 23, 1893, pursuant to warrants of attorney, after the defalcations had been committed and discovered.

Now it has already been held by me in this cause that nothing has been shown by the complainant to entitle -him to be relieved by a court of equity from the payment of the damages alleged, and covered by the bonds. But this contention about interest having arisen, it becomes necessary for me to consider the effect in the Courts of Law, as well as in the Court of Chancery, of the judgments which have been entered upon the bonds in order to ascertain the rules which must govern the Court in formulating its decree, the terms of which necessarily involve the amount collectible under them.

In the case of what is commonly called a money bond containing a warrant of attorney to confess judgment for a penal sum, it is required by our statute that "when judgment is confessed by virtue of a warrant of attorney for a penalty, the attorney confessing the judgment shall, in a written direction to the officer entering the judgment, set down the real debt and the time from which interest is to be calculated;

which shall be entered by said officer upon the docket of the judgment." *Revised Code as amended in* 1893, *page* 811, *ch.* 110, *sec.* 14.

In the case, however, of a bond with what is commonly called a collateral condition, accompanied by a warrant of attorney to confess judgment for a penal sum, such as the bonds in controversy in this cause, bonds not for the payment of money, but for the performance of some collateral condition, there is no statutory provision and they are governed by the common law rule.

Certain provisions for the assignment of breaches in actions on such bonds are contained in *chapter* 117 of the *Revised Code as amended in* 1893, but *section* 14 of that *chapter*, *page* 862, provides that "none of the foregoing provisions shall extend to a warrant of attorney to confess judgment, nor to any action or judgment under, or confessed in pursuance of such warrant of attorney."

In *Staats vs. Herbert, et al.*, 4 *Del. Ch.* 508, 518, the subject is discussed by Chancellor Bates, as follows:

"But it appears that upon judgments entered by warrant of attorney, as this is, upon a bond in a penal sum with condition other than for the payment of money, there is no proceeding at law for suggesting breaches of the condition and assessing the damages. Judgments entered under warrants of attorney were held, by construction, to be not within the *Statute of* 8 and 9 *Will.* III for ascertaining damages in suits on bonds and penal sums, and such judgments are expressly excepted from our statute on the same subject. *Rev. Code* (1852) 416.

"At common law, prior to the Statute of Will. III, all judgments recovered on bonds or penal sums were rendered for the whole penalty upon proof of a breach of the condition, without any proceeding at law to assess the damages; and under the common law rule, that execution must follow the judgment, executions, issued upon such judgments, went for the whole penalty, subject to the direction of the plaintiff on the judgment as to the sum to be collected under the execution. If more than the damage actually sustained was ex-

acted from the defendant he could be relieved only by a court of equity. 1 *Tidd.* 584; *Foster on Scire Facias* (73 *Law Lib.*) (33); 2 *Burr* 824; 5 *T. R.* 636.

"It was to obviate this necessity of a resort to equity that the Statute of Will. III, and our own on the same subject, were passed. These statutes provide that in all suits on bonds and penal sums the damages shall be assessed upon breaches either assigned in a case pleaded to issue, or suggested on the record, in the case of a judgment by default or on demurrer; and the damages being thus ascertained, the judgment is to be rendered for their amount only. But judgments entered under warrants of attorney not being within the statute are governed by the common law; and consequently, all such judgments are entered for the penalty as debt, and execution goes for the penalty, with no method of ascertaining, upon the record, the actual damage sustained, except, that when the judgment entered under a warrant of attorney is to secure a money debt, it is required under our statute, *Rev. Code* (1852) 391, that the real debt, with the time from which interest is payable, be entered on the record; and although execution even then goes for the penalty, the real debt, with interest, being endorsed on the execution, is alone collected. But where the condition of the bond, on which judgment is entered under a warrant, is not for the payment of money, but for the performance of some collateral undertaking, there is no statute applicable, and consequently, the execution following the judgment goes for the penalty without anything on the record to restrain the plaintiff from collecting the whole. He proceeds at his peril, subject to the interference of a court of equity, if he takes the execution before any breach of the condition has been committed, or, if after a breach he directs the collection of a larger sum than the damages actually sustained. This Court in a proper case will restrain the execution, direct an issue of *quantum damnificatus*, and, when the damages are ascertained upon the trial of such an issue, it will grant relief upon the payment of such damages. 2 *Sto. Eq. Jur. sec.* 1314; *Sloman vs. Walter*, 1

*Bro. C. C.* 418; *Hardy vs. Martin,* 1 *Cox* 64; *Errington vs. Aynesley,* 2 *Bro. C. C.* 342."

The complainant in this cause did not invoke the interference of the Court of Chancery on the ground that the bank was seeking the collection of a larger sum than the damages actually sustained, nor is there any dispute between counsel at this time with reference to the amount of damages covered by the second bond, inasmuch as the defalcations covered by that bond amounted to $27,750 without interest, a sum largely in excess of the amount for which judgment was entered, which of course was for the penalty, $15,000.

It is in like manner admitted that the defalcations covered by the first bond, with interest added, calculated from the date of each defalcation to the date of the judgment, amounted to a sum largely in excess of the judgment on that bond.

The defalcations, however, without interest amount to a sum less than the penalty, to wit, $11,500, and it is contended by counsel for the complainant that under the judgment entered on that bond the bank is not entitled to collect the judgment entered for the penalty, but only $11,500, the amount actually embezzled, without the addition of interest.

If the contention between the counsel involved any disputed question of fact, it would be necessary for me to direct an issue of *quantum dammnficatus,* but as the point at issue is purely a question of law, there can be no issue sent to a jury and it must be decided by the Court.

Each defalcation was a breach of the condition of the bond, and in any ascertainment of the damages actually sustained by the bank in consequence of the breaches of the condition of the bond, interest, calculated from the date of each defalcation to the date of the judgment, would necessarily constitute a part of the damages. The amount of the judgment to be entered on the bond was limited by the terms of the bond, and the accompanying warrant of attorney, to the penalty, $15,000.00, but up to the penalty, defalcations and interest upon the defalcations are alike recoverable, and I

am unable to see any ground for making a distinction between them.

The complainant's counsel cited the following cases in support of his contention:

*Murfree on Official Bonds sec.* 689; *McGill vs. Bank of U. S.,* 12 *Wheat.* 511; *s. c.* 1 *Paine C. C.* 670; *Washington Bank vs. Shurteff,* 4 *Metc.* 30; 1 *Brandt, Sur. G. sec.* 112; *United States vs. Poulson,* 30 *Fed. Rep.* 231; *United States vs. Curtis,* 100 *U. S.* 119.

Upon examination and analysis of the foregoing cases, however, it will be found that not one of them sustains the view urged by the complainant's counsel.

The respondent's counsel cited the following cases, which support the principle I have laid down:

*Murfree on Official Bonds sec.* 326; *Sedg. Dam. sec.* 303; *Supervisors vs. Clark,* 92 *N. Y.* 391; *Supervisors vs. Birdsell,* 4 *Wend.* 453; *Wyman vs. Robinson,* 73 *Me.* 384; *McClure vs. Dunkin,* 1 *East* 436; *Harris vs. Clapp,* 1 *Mass.* 308; *United States vs. Denvir,* 106 *U. S.* 536; *United States vs. Knowles,* 106 *U. S.* 537; *Guarantee Co. vs. Bank,* 80 *Fed. Rep.* 766, 785; *Sparks vs. Farmers' Bank,* 3 *Del. Ch.* 225.

It seems manifest, therefore, that at the time the judgments were entered on the bonds, the breaches of condition having been committed, and the damages actually sustained by the bank having amounted to more than the amount of the judgments in each case, it necessarily followed that the whole amount of the judgments, or in other words the penalty became immediately collectible on execution following the judgment.

It only remains to consider very briefly the one other question raised by the complainant's counsel in his objections to the proposed decree.

He urges that the bank should be restrained by this Court from collecting interest on the judgments from their date, because the amount collectible against the sureties is first legally ascertained by its decree, although the collection of anything on those judgments has been restrained by the injunction of this Court for more than five years at the

suit of complainants—a suit brought by the surety, as already stated, not on the ground that the judgments, the collection of which has been restrained, were in excess of the damages actually sustained, but on the ground that the bank was not entitled to collect anything from the sureties.

As soon as judgment is entered on a bond, *transit in rem judicatam*, the nature of the demand is altered.

In the case of *Cook vs. Gray*, 3 *Houst.* 49, heard in the Court of Errors and Appeals on a writ of error to the Superior Court after it had been heard by the Court in banc, the Court after remarking that the bail is not liable for interest on the judgment against a principal for an amount exceeding the penalty, say, "Of course, judgment against him would bear interest from recovery" and no case can be found in which it was ever suggested that a valid judgment did not bear interest from the date of entry or recovery, no matter for what or against whom it was recovered.

I have already shown in this discussion, that in our Courts of Law, judgments in pursuance of warrants of attorney to confess judgment for the penalty on bonds with a collateral condition, are collectible with interest as of course, from the date of recovery or entry, without regard to the question whether a breach of condition had been committed, or whether the damages actually sustained were equal to the amount of the judgment. In other words, execution follows the judgment.

This being the effect of such judgments in a court of law, let us consider what is the nature and extent of the jurisdiction of the Court of Chancery with respect to them, when it is contended in that Court that the breaches had not been committed prior to the recovery of the judgment, or that the damages actually sustained were less than the amount of the judgment, which the plaintiff seeks to collect as it stands on the docket. Obviously, on bill filed making out a proper case, it would restrain by preliminary injunction the collection of such a judgment until the merits of the complainant's contentions could be determined. Then, if it should be ascertained that the breaches had been committed before the

judgment was recovered, and that the damages actually sustained had equalled or exceeded the amount of the judgment and that the judgment was otherwise valid, this Court could not do otherwise than withdraw its hand and leave the judgment creditor free to exercise his legal right to collect the judgment with interest from the date of its recovery by execution following the judgment.

In the present case, having ascertained that the breaches had been committed before the entry of the judgments, the collection of which was restrained, and also that the damages sustained by the bank in consequence, amounted, prior to the entry of the judgment, to a sum exceeding the penalty for which judgment was entered on each bond, it follows necessarily that I must dissolve the injunction, which for more than five years has restrained the bank from collecting its judgments against the sureties.

The decree of this Court cannot forbid the respondent to exercise the right to collect the full amount of its judgments, with interest thereon from the date of entry, and at the same time, in the same decree, declare that it has been ascertained by it that from and after the date of those judgments the respondent had the right to collect them with interest by execution following the judgment—the exercise of that right having been prevented by the injunction of this Court obtained at the suit of the judgment debtor.

If the law were otherwise, it would always be within the power of a defendant in such a judgment to deprive his creditor of his lawful interest during the whole period required by the Court of Chancery to sift out the merits of a suit in chancery and ascertain the amount collectible on the judgment, if any.

The proposed decree will be signed and the respondent left free to collect the full amount of the judgments, with interest from their date.

The following was the decree entered in this cause:

And now to wit, this Third day of December, A. D., 1898, this cause having been heard before the Chancellor upon the bill, answers, exhibits and depositions, and having been de-

bated by solicitors for the respective parties, and the same having been held under advisement until this date and maturely considered, and it appearing from the proofs in the cause that the complainant, together with John Sparks, Christian Messick and Joshua Maris, became bound in the sum of Fifteen thousand dollars to The First National Bank of Wilmington, one of the defendants as surety for Peter T. E. Smith, in an official obligation entered into by him as teller of the said The First National Bank of Wilmington, bearing date the first day of June, A. D., 1879, the said obligation having been entered into upon the selection of the said Peter T. E. Smith as teller as aforesaid, and as security for the faithful performance of his duties as such teller during the term of office which should be held by him pursuant to such selection; aad it appeared further that although the said Peter T. E. Smith was re-elected teller of said bank in the years 1880, 1881, 1882, 1883, 1884 and 1885 he gave no new official bond upon such re-election, until the sixth day of July A. D., 1885, so that the term of office for his good behavior in which the sureties in the said bond dated June First, A. D., 1879, became bound, continued until the giving of the official bond dated July 6th, 1885, hereinafter mentioned, upon his re-election as teller of said bank in said month of July;

And it further appearing from the proofs in the cause, that while the aforesaid official bond dated June 1st, 1879, was in force, the said Peter T. E. Smith abstracted from the said The First National Bank of Wilmington, and converted to his own use the following sums of money on the following dates, to wit:

| | |
|---|---:|
| January 9, 1880 | $100 |
| April 22, 1880 | 50 |
| March 31, 1881 | 150 |
| June 4, 1881 | 200 |
| July 30, 1881 | 200 |
| August 8, 1881 | 50 |
| August 17, 1881 | 130 |
| December 30, 1881 | 500 |

Decree.

| | |
|---|---:|
| February 20, 1882 | 300 |
| March 4, 1882 | 300 |
| May 10, 1882 | 500 |
| June 1, 1882 | 300 |
| June 19, 1882 | 150 |
| July 27, 1882 | 250 |
| August 18, 1882 | 200 |
| September 4, 1882 | 150 |
| September 28, 1882 | 200 |
| October 21, 1882 | 150 |
| November 7, 1882 | 100 |
| November 29, 1882 | 350 |
| December 21, 1882 | 50 |
| January 18, 1883 | 100 |
| March 12, 1883 | 100 |
| April 25, 1883 | 150 |
| May 18, 1883 | 150 |
| June 13, 1883 | 100 |
| July 10, 1883 | 200 |
| July 27, 1883 | 300 |
| August 13, 1883 | 200 |
| September 4, 1883 | 100 |
| September 12, 1883 | 100 |
| September 21, 1883 | 100 |
| September 26, 1883 | 300 |
| October 11, 1883 | 200 |
| November 9, 1883 | 100 |
| December 4, 1883 | 200 |
| January 18, 1884 | 200 |
| February 7, 1884 | 350 |
| March 21, 1884 | 150 |
| April 17, 1884 | 200 |
| June 7, 1884 | 300 |
| July 29, 1884 | 450 |
| August 28, 1884 | 350 |
| October 2, 1884 | 450 |
| October 22, 1884 | 450 |
| January 22, 1885 | 300 |

March 20, 1885............................ 350
April 30, 1885............................... 300
June 11, 1885............................. 500

aggregating the sum of eleven thousand one hundred and thirty dollars ($11,130), and also abstracted and converted to his own use at various times between the first day of November, 1879, and the sixth day of July, 1885, other sums amounting in the aggregate to the sum of five hundred and twenty dollars ($520), making the total aggregate of the said sums so abstracted between November 1, 1879, and July 6, 1885, the sum ·of eleven thousand six hundred and fifty dollars ($11,650).

And it appearing from the proofs that the said complainant together with John Sparks and Hannah L. Sparks, became bound in the sum of fifteen thousand dollars to The First National Bank of Wilmington, one of the defendants, as surety for the said Peter T. E. Smith in another official obligation entered into by him as Teller of the said The First National Bank of Wilmington, bearing date the sixth day of July, A. D., 1885, the said obligation having been entered into upon the selection of the said Peter T. E. Smith as Teller as aforesaid and as security for the faithful performance of his duties as such Teller during the term of office which should be held by him pursuant to said selection.

And it appearing further that although the said Peter T. E. Smith was re-elected Teller of said Bank in the years 1886, 1887, 1888, 1889, 1890, 1891, 1892, and 1893, he gave no official bond· upon ruch re-election, so that the term of office for his good behavior in which the sureties in said bond dated July 6, 1885, became bound continued until the discovery of the defalcations by the said Peter T. E. Smith by said bank on or about the eighteenth day of February, A. D. 1893.*

And it further appearing from the proofs in the cause that while the aforesaid official bond dated July 6th, 1885, was in force, the said Peter T. E. Smith abstracted from the

*See footnote on p. 278 *post.*

said The First National Bank of Wilmington and converted to his own use, the following sums of money on the following dates to wit:

| | |
|---|---:|
| July 10th, 1885 | $ 500 |
| October 21st, 1885 | 1000 |
| April 20th, 1886 | 2500 |
| July 17th, 1886 | 2000 |
| February 25th, 1887 | 1000 |
| June 30th, 1887 | 1500 |
| October 31, 1887 | 1500 |
| May 30th, 1888 | 2000 |
| September 29th, 1888 | 2000 |
| February 2d, 1889 | 1000 |
| April 22d, 1889 | 500 |
| April 26th, 1889 | 250 |
| May 20th, 1889 | 1000 |
| August 3d, 1889 | 2000 |
| January 22d, 1890 | 500 |
| February 8th, 1890 | 200 |
| February 20th, 1890 | 500 |
| April 25th, 1890 | 1000 |
| June 2d, 1890 | 1000 |
| September 30th, 1890 | 800 |
| October 29th, 1890 | 1000 |
| January 9th, 1891 | 500 |
| February 13th, 1891 | 1000 |
| April 11th, 1891 | 500 |
| July 2d, 1891 | 500 |
| July 3d, 1891 | 1500 |

making the aggregate sum of twenty-seven thousand seven hundred and fifty dollars.

And it further appearing from the proofs that the said several defalcations were committed by the said teller secretly and that the same were by him concealed from The First National Bank of Wilmington, and were not discovered by or become known to said bank until the eighteenth day

of February, A. D. 1893, upon which day the official relationship of the said Peter T. E. Smith with said bank was terminated.

It is therefore considered by the Chancellor that the complainant as one of the sureties for the said Peter T. E. Smith in his official bond dated June 1st, 1879, ought in equity and good conscience to reimburse and pay to The First National Bank of Wilmington, the aforesaid several sums of money hereinbefore mentioned, so abstracted as aforesaid between the first day of June, 1879, and the sixth day of July, 1885, aggregating the sum of eleven thousand six hundred and fifty dollars ($11,650,00) with interest on said several sums from the several dates whereon the same were abstracted respectively, and with interest on said sum of five hundred and twenty dollars ($520.00) part of said sum of eleven thousand six hundred and fifty dollars ($11,650.00) from the sixth day of July, A. D. 1885; and that the said complainant as one of the sureties for the said Peter T. E. Smith in his said official bond dated July 6th, 1885, ought in equity and good conscience to reimburse and pay to The First National Bank of Wilmington the aforesaid several sums of money hereinabove mentioned so abstracted as aforesaid between the sixth day of July, A. D. 1885, and the eighteenth day of February, A. D. 1893, *aggregating the sum of twenty-seven thousand seven hundred and fifty dollars ($27,750.00), with interest on said several sums from the several dates whereon the same were abstracted respectively.

And it appearing to the Court that the aggregate amount of the said several sums so abstracted as aforesaid between the first day of November, 1879, and the sixth day of July, A. D. 1885, with interest thereon from the several and respective dates whereon the same were abstracted will make an

---

*This date is a manifest error, doubtless a clerical one. It should be July 5, 1891, that being the date at which the life of the second bond ended, as already stated in this decree. This error does not affect the total amount as the above table shows the last item included under date of July 3, 1891. See note at the end of this case in the Supreme Court *post p.*

Decreè.

aggregate sum larger than the amount of said bond dated June 1st, 1879, and that the aggregate amount of said several sums so abstracted as aforesaid between the sixth day of July, A. D. 1885, and the eighteenth day of February, A. D. 1893*, with interest thereon from the several and respective dates whereon the same were abstracted, will make an aggregate sum larger than the amount of said bond dated July 6th, 1885.

It is therefore ordered, adjudged and decreed by the Chancellor that the injunction heretofore issued in this cause be and the same is hereby dissolved, and that the said defendant, The First National Bank of Wilmington, have liberty to collect its judgment in the Superior Court of the State of Delaware in and for New Castle County against the complainant for fifteen thousand dollars, with interest thereon from the date of the recovery thereof and costs thereon, (No. 299 of February Term, A. D. 1893), being a judgment recovered on said official bond dated June 1st, 1879, and also have liberty to collect its other judgment in said Superior Court against the complainant for fifteen thousand dollars with interest thereon from the recovery thereof and costs thereon, No. 301 of February Term A. D. 1893) being a judgment recovered on said official bond dated July 6th, 1885.

And it is further ordered that the complainant pay the costs of this cause within three months or attachment.

JOHN R. NICHOLSON,
*Chancellor.*

Upon the entry of this decree the complainant prayed an appeal, which was granted, and the case was thereupon removed to the to the Supreme Court.

---

*See note on *p*. 278, *ante.*