JUDGE LINDSAY
delivered the opinion oe the court.
The judgment now before this court for revision is that rendered in the cross-action of the National Bank of Lebanon v. E. A. Graves, D. L. Graves, and R. C. Harris, sureties for Mitchell, the defaulting cashier.
*26 Although the bond sued on was executed to the president and directors of the bank, it is evident that it was for the protection of the association, and no sufficient reason is perceived why it may not maintain the action.
The right to take advantage of a supposed defect of parties appearing on the face of the cross-petition has been waived. Appellants did not make this defect a ground of demurrer, nor was it taken advantage of by plea. The answer goes to the merits of the controversy, and upon the issues raised the cause' was prepared and submitted for judgment. The fact that there is a defect of parties plaintiff can not be made a question for the first time in this court.
The National Bank of Lebanon organized under the provisions of the national currency act of June 3, 1864. It commenced business on or about the 3d of August, 1869, at which time Mitchell was selected as cashier, and was at once inducted into office. Although required to execute bond immediately, for reasons not satisfactorily explained by the record the bond was not delivered until about the 1st of November following. In June, 1870, Mitchell was discovered to be a defaulter to a large amount. He failed to make good the losses occasioned by his breach of duty, or to sufficiently indemnify the bank, and this action was instituted to recover from his bondsmen the amount of these losses.
From what has already been said it is not necessai-y to notice further the technical defenses relied on by appellants, except to state that we do not regard it as essential that banking institutions doing business under the national currency act shall signify their acceptance of the official bonds of their cashiers by a written memorandum to that effect entered upon the journals or minute-books kept by their directory.
The acceptance of the bond may be presumed from the fact that after it has been submitted to the directory for approval it is retained by the bank, and the cashier permitted *27 to enter upon or continue in the discharge of his duties; and that it was presented to and approved by the directory may be established by oral testimony. (Bank of United States v. Dandridge, 12 Wheaton, 64; Dedham Bank v. Chickering, 3 Pickering, 335; Amherst Bank v. Root, 2 Met., Mass., 522; Union Bank v. Ridgely, 1 Har. & G. 324; 1 Morse on Banking, 223.)
The defalcations for which appellants are sought to be held liable are alleged to have occurred between the 14th of September, 1869, and the 3d of June, 1870. The court below adjudged that the sureties in the bond should account for such as occurred after its acceptance, and rendered judgment against them for $8,089.23.
The first business transacted by the bank after its organization was the purchase of the assets of the banking firm of Burton, Mitchell & Co.
Mitchell, the defaulting cashier, was a member of that firm, and had been acting as its cashier. The National Bank accepted from Burton, Mitchell & Co. bills and notes represented to amount to about fifty-one thousand dollars, but which in point of fact amounted to only about thirty-nine thousand dollars. This discrepancy was the result of embezzlements upon the part of Mitchell while acting as cashier for said firm. It may be presumed that Burton, the senior member of the firm, who became one of the directors of the National Bank, was ignorant of these embezzlements. The directory seem to have relied implicitly upon the integrity of Mitchell, and hence he was enabled not only to conceal the frauds practiced on Burton, Mitchell & Co., but by such concealment to commence the discharge of his duties as cashier of the National Bank by a fraud upon it.
In October, 1869, the banking association, pursuant to the provisions of section 34 of the national currency act, and the fl.mAnrlmp.nt thereto of March 3, 1869, made a report to the *28 comptroller of the currency, and on the 23d day of that month caused it to be published in the Lebanon Clarion, showing in detail and under appropriate heads its resources and liabilities at the close of business October 9, 1869. This report was sworn to by Mitchell, and certified to be correct by three members of the directory.
Similar reports were made and published in the same newspaper touching the condition of the association on the 22d of January, the 24th of May, and the 9th of June, 1870. None of these reports showed embezzlements upon the part of the cashier or any officer connected with the bank. They were not only not calculated to excite suspicion as to the manner in which the affairs of the association were managed, but tended to inspire the public with confidence in its prosperity and, in the integrity of those to whom its business affairs were committed.
Appellants plead and rely upon the statements thus officially promulgated by the officers of the bank as constituting an estoppel upon it to assert against them claims that can not be established without showing that these official reports, made and published in obedience to law, were not true. We are not inclined to the opinion that they can claim immunity upon account of any report made after they became the sureties of Mitchell. The reports are sworn to by him, and it may be assumed that upon his representations, and upon what appeared from the books of the association as kept by him, the directors were induced to certify to their accuracy.
The directors may have been negligent in the discharge of their duties, and this negligence may have enabled Mitchell for the time to misappropriate the funds of the bank, and to conceal its true condition by the false reports made to the comptroller of the currency and by false entries upon the books of the association. But this negligence can not avail the sureties who covenanted that their principal should “well *29 and truly perform the duties” of his position, and should “ well and truly account for all moneys and other valuables that ‘might’ pass through his hands.” Their covenant is unconditional, and no failure of duty upon the part of the directors of the association, short of actual fraud or bad faith, can be deemed sufficient to exonerate them from its performance. The exaction of the bond implies that the association was not willing to rely alone upon the watchfulness and care of the directory. It required in addition to that safeguard that the honesty and fidelity of its cashier should be guaranteed by sureties who were able to make good any losses it might sustain by reason of his negligence or dishonesty.
There is a question, however, arising upon the facts stated in the pleading and fully sustained by the proof, the decision of which, it seems to this court, must be in favor of the sureties; and this question being decided in their favor, their exoneration from liability on account of Mitchell’s misconduct while acting as appellee’s cashier, and after the bond was delivered and accepted, follows as a necessary sequence.
There is no principle of law better settled than that persons proposing to become sureties to a' corporation for the good conduct and fidelity of an officer to whose custody its moneys, notes, bills, and other valuables are intrusted have the right to be treated with perfect good faith. If the directors are aware of secret facts materially affecting and increasing the obligation of t’he sureties, the latter are entitled to have these facts disclosed to them, a proper opportunity being presented. (Morse on Banking, 226.)
White and Tudor, in their note to the case of Rees v. Berrington (2 Leading Cases in Equity, page 707), state the rule as follows: “Wherever therefore there is any misrepresentation, or even concealment from the surety, of any material fact which had he been aware of he might not have entered into the contract of suretyship, it will thereby be *30 rendered invalid, and the surety will be discharged from his liabilities.”
The cases cited by the commentators fully sustain the principle as stated.
Mr. Justice Story takes even broader ground: “Thus, if a party taking a guaranty from a surety conceals from him facts which go to increase his risk, and suffers him to enter into the contract under false impressions as to the real state of facts, such concealment will amount to a fraud, because the party is bound to make the disclosure, and the omission to make it under such circumstances is equivalent to an affirmation that the facts do not exist.” (1 Story’s Equity Jurisprudence, sec. 215.)
The learned judge cites in this connection from Maltby’s case (1 Dow, Parliament. Cases) the instance of a party who, knowing himself to have been cheated by his clerk, concealed the fact, applied for security in such a manner and under such circumstances as held out the clerk as one whom he considered as a trustworthy person, and thereby induced another to become his surety. The contract of suretyship thus obtained was held to be void, the silence under such circumstances being treated as expressive of a trust and confidence held out to the public equivalent to an affirmation.
It may not be true that the directors of the Lebanon bank had actual knowledge of the frauds committed by Mitchell while cashier of Burton, Mitchell & Co., nor of the false entries made by him on the books of the institution under their control in order to conceal those frauds, but it is true that either with or without examination they published reports of the affairs of the banking institution, the natural if not the necessary effect of which was to mislead the public. That these reports reached the eyes of appellants we can not doubt.
They each resided in or near the town of Lebanon, and were subscribers to and readers of the local paper in which *31 the publications were made; and as they were each largely interested as stockholders in the banking institution, it may be assumed that they read and examined at all events the first official statement made by the officers to whom they had intrusted the management of that portion of their estate invested in the stock of the banking association. If it could be shown that the directors were cognizant of the fraud of Mitchell, committed on the first day of his connection with the bank and in the performance of his first duty as cashier, and that they concealed this fact from these appellants, and permitted the false statement of October 9, 1869, to be forwarded to the comptroller of the currency and published to the world, there could be no shadow of doubt that the concealment and publication would amount to a fraud upon the sureties.
It is proper, however, to consider the legal effect of two circumstances connected with the failure of the directory of the bank, to apprise the sureties of the fraud of Mitchell, and of the publication of October 23d in the Lebanon newspaper. The first is that the directors, or at least so many of them as were sworn as witnesses, state that they were not apprised of the perpetration of the fraud. The second is that the report of October 9, 1869, published on the 23d of that month, was but a statement of the condition of the affairs of the association as shown by its books.
Upon the first question it is to be observed that several of the directors, and among them Burton, of the firm of Burton, Mitchell & Co., upon whose indorsement its assets were received by the Lebanon Bank, were not sworn at all; and further, that it appears upon the journal kept by the directory, as of date August 3, 1869, that “'the bills of exchange and accounts of the firm of Burton, Mitchell & Co., bankers, having been submitted for examination and examined, it was resolved by the board of directors to receive the *32 same, with the indorsement of Messi-s. Burton, Mitchell & Co., and the cashier was directed to transfer the same to the books of the National Bank.” Whether this written memorandum, kept by the directory as evidence of its official action, is or not conclusive as to the examination of the bills of exchange and accounts of the firm of Burton, Mitchell & Co., need not here be decided. The fact of the examination is not directly contradicted by any evidence in the case, and for the purposes of this litigation the presumption should be indulged that it was actually made.
From the depositions of the president of the bank, of Wilson, a director, and of Wilkins, who was first the clerk and is now the cashier of the institution, it is manifest that the most cursory examination of 'the bills, notes, and accounts turned over to the bank by Burton, Mitchell & Co. would have disclosed a deficit of more than twelve thousand dollars.
We can not, without disregarding the proof before us, fail to conclude that the directory either was advised of this discrepancy in Mitchell’s accounts, or that it relied on his representations and the indorsement of Burton, Mitchell & Co., and made no examination, notwithstanding the bills, notes, and accounts purchased amounted in the aggregate to more than half as much as the capital of the institution for which they were acting.
The directors may not have been bound to notify the sureties of the manner in which this transaction was conducted ; but most assuredly these parties had the right, under the circumstances, to presume that in the first business transaction of the bank, involving as it did so considerable an. amount, the directory exercised at least slight diligence, and this presumption was greatly strengthened by the published report appearing on the 23d of the following October. A fraud may be perpetrated as well by the assertion of facts that do not exist, ignorantly made by one whom the person acting *33 upon the assertion has the right to suppose has used reasonable diligence to inform himself, as by concealing facts known to exist which in equity and good conscience ought to be made known.
The publication as to the resources and liabilities of the association on the 9th of October, 1869, does not purport to have been made from its books. It was styled “Report of the Condition of the National Bank of Lebanon at the close of business October 9, 1869.” The resources and liabilities are stated under appropriate heads. The report is sworn to by the cashier, and its accuracy attested by three members of the board of directors.
There is nothing in the publication to indicate that it was founded upon the books of the association. The clear import of the language used is that it exhibits the actual condition of the affairs of the bank.
It is in proof that the forms furnished by the comptroller of the currency authorized the reports to be made out from the books; but it is not shown that the sureties knew any thing about these forms; and looking to the law defining the duties as well of the comptroller as of the officers of the bank, they would acquire no such information.
The 34th section of the currency act requires every association organized under its provisions at stated times to make reports to the comptroller, which “shall exhibit in detail and under appropriate heads the resources and liabilities of the association before the commencement of business on the morning of the first Monday of the months of January, April, July, and October of each year.” The amendment of March 3, 1869, requires five of these reports each year, to be verified by the oath or affirmation of the president or cashier and attested by the signature of at least three of the directors, each of which is to be published in a newspaper published in the place where the association does business, if there be one, *34 and if not, then in a newspaper published in the county nearest thereto. This amendment provides, as did the original act, that the resources and liabilities of the association shall be reported; and as conclusive evidence that the actual and not the apparent resources and liabilities are to be reported, the comptroller is empowered by the amendatory act to call for special reports from any particular association whenever in his judgment it shall be necessary, “in order to a full and complete knowledge of its condition.”
It seems therefore that before the delivery and acceptance of the cashier’s bond, and before appellants had become guarantors for his diligence, honesty, and fidelity, the banking association, pursuant to the provisions of the law to which it owed its existence, published to them and to the world a statement of its condition, from which it appeared that its affairs were being prudently and honestly administered, and from which they and the public had the right to believe that the cashier, to whom had been intrusted the moneys, notes, and valuables of the bank, had up to that time acted as a trustworthy person.
If the sureties acted upon the impression thus created by the affirmative act of the party now claiming to enforce the stipulations of their bond, it is plain that they should be discharged from liability.
For reasons satisfactory to our minds we have already decided that it should be presumed that the sureties did read and examine the report published in the Clarion of the 23d of October, 1869. It yet remains to be determined whether the bond was accepted before or after that time. It bears no date except “the — day-, 1869.” . The legal presumption therefore is that it did not become binding on the bondsmen until the last day of that year.
The bank fails to show the exact date of its delivery. One of the directors gives it as his recollection that it was about *35 the 1st of October, 1869. The president and one other director fix the time of delivery at about the 1st of November, 1869, and the president states as a circumstance conducing to sustain his recollection that he was in that year a member of the state legislature, and that the bond was handed to him a month or more before he left for Frankfort, which was early in December. The directory itself was not willing to fix the date of the acceptance of the bond, and in an order entered upon its minute-book, purporting to record the action of the board at the time of its approval, neither the month nor the day is given.
Considering the presumption arising from the want of a specific date to the bond and the preponderance of the testimony offered by the bank itself, we conclude that it was not accepted earlier than the 1st of November, 1869, about one week subsequent to the publication of the report of October 9th of that year.
We have therefore a case in which the directory of the bank held out to others as a trustworthy officer a man who had been guilty of repeated embezzlements and frauds, all of which might have been discovered by the exercise of slight diligence. However innocently the publication tending to show that Mitchell was an honest and faithful officer may have been made, the fact remains that the public had the right to act upon the presumption that the three directors attesting the accuracy of the statements contained in the publication had made some investigation at least to inform themselves as to the matters to which it related.
The effect of the published report was to inspire the public with confidence in the officers of the bank, to disarm suspicion, and to prevent inquiry.
The losses occasioned by the fraudulent appropriations by Mitchell of the bank’s money after the acceptance of his bond must fall upon either the association or upon his sureties. The *36 latter are free from blame. ■ They acted in the matter with reasonable prudence and discretion. They relied upon the truth 'of representations made by those having the right to speak for the bank. These representations have turned out to be untrue. Had the sureties suspected that they were untrue, it can not be supposed they would have entered into the contract of suretyship. Such being the case, the contract must be adjudged invalid.
The judgment against the sureties is reversed, and the cause remanded with instructions to dismiss appellee’s cross-petition.