# CASE ADJUDGED AND DETERMINED

## ON APPEAL FROM THE COURT OF CHANCERY

### IN THE SUPREME COURT

#### OF THE

## STATE OF DELAWARE

*ϐ*

NATHAN LIEBERMAN,

Complainant below Appellant,

vs.

THE FIRST NATIONAL BANK OF WILMINGTON,

Respondent.

*Supreme Court, on appeal, January T.* 1900.

1. In a suit by the bank against the surety on the official bond of the teller, it is no defense that the defendant was induced to become surety because of the false representations of the cashier "that the teller's accounts were all straight; that there would be no risk in going on his bond, as he was a good, reliable and honest man, and as paying teller could not take anything," etc.; it not appearing that the cashier was authorized by the bank to make any representations in the matter, or that it was in the line of his duty as cashier. Such representations could not bind the bank, and the surety would take them at his own risk as the individual judgment of the cashier.

2. Neither is it any defense that the surety was induced to become such surety by reason of the published report of the bank immediately before he became surety, showing its resources and liabilities, which were false. Such publication has no relation to such suretyship, nor does it disclose whether the teller is honest or dishonest.

3.   In cases of official bonds, concealed fraud on the part of the prin-
cipal will deprive both principal and surety of the benefit of the
statute of limitations; the statute does not begin to run until
the fraud is discovered.

4.   It is true that èquity will not relieve against the bar of the statute
in favor of the party who has been in *laches* in not using the
means in his power to discern the fraud, but the rule is that it is
good faith and not diligence which is required of the creditor as a
condition of his right to hold the surety; the creditor or obligee
in a bond is not obliged, for the benefit of sureties, to watch the
principal.

APPEAL FROM THE COURT OF CHANCERY*.—The facts in
this case are fully stated in the report of the case in the Court
of Chancery. *Ante p.* 229.

The assignment of errors was as follows:

The complainant complains and says that in the records
and proceedings of the above entitled cause there is manifest
error in this, to wit:

1. The Chancellor erred in ordering, adjudging and de-
creeing that the injunction issued in this cause be dissolved.

2. The Chancellor erred in finding that the term of of-
fice of Peter T. E. Smith, for his good behavior, in which the
sureties in the bond, dated June 1st, A. D. 1879, became
bound, continued until the giving of the official bond, dated
July 6th, A. D. 1885.

3. The Chancellor erred in finding that while the bond
dated June 1st, A. D. 1879, was in force, the said Peter. T.
E. Smith, abstracted from the said The First National Bank
of Wilmington, the sum of eleven thousand, six hundred and
fifty dollars.

4. The Chancellor erred in finding that the term of office
of Peter T. E. Smith, for his good behavior, in which the sure-
ties in the bond, dated July 6th, A. D. 1885, became bound,

*As this case on appeal has been already reported in 2 Penne-
will, 416, the syllabus as prepared by Judge Pennewill, and the opinion
of the Supreme Court as there reported, are used here without
change.

continued until the discovery of the defalcations by the said Peter T. E. Smith by said bank on or about the 18th day of February, A. D. 1893.

5. The Chancellor erred in considering that the complainant as one of the sureties for the said Peter T. E. Smith, in his official bond, dated June 1st, A. D. 1879, ought in equity and good conscience to reimburse and pay to the said The First National Bank of Wilmington the several sums of money abstracted by the said Peter T. E. Smith, between the first day of June, A. D. 1879, and the 6th day of July, A. D. 1885, aggregating the sum of eleven thousand, six hundred and fifty dollars ($11,650), with interest on the said several sums of money so abstracted from the several dates whereon the same were abstracted respectively, and with interest on the sum of five hundred and twenty dollars ($520), part of said sum of eleven thousand six hundred and fifty dollars from the 6th day of July, A. D. 1885.

6. The Chancellor erred in considering that the complainant as one of the sureties for the said Peter T. E. Smith, in his official bond, dated July 6th, A. D. 1885, ought in equity and good conscience to reimburse and pay to The First National Bank of Wilmington the several sums of money abstracted by the said Peter T. E. Smith between the 6th day of July, A. D. 1885, and the 18th day of February, A. D. 1893, aggregating the sum of twenty-seven thousand seven hundred and fifty dollars, with interest on the said several sums of money so abstracted from the several dates whereon the same were abstracted respectively.

7. The Chancellor erred in ordering, adjudging and decreeing that the said defendant, The First National Bank of Wilmington have liberty to collect its judgment in the Superior Court of the State of Delaware, in and for New Castle County, against the complainant for fifteen thousand dollars, with interest thereon from the date of the recovery thereof and costs thereon, (No. 299 of February Term, A. D. 1893) being a judgment on said official bond, dated June 1st, A. D. 1879, and also have liberty to collect its other judgment in said Superior Court against the complainant for fifteen thousand

dollars, with interest thereon from the recovery thereof and costs thereon, (No. 301 of February Term, A. D. 1893) being a judgment recovered on said official bond, dated July 6th, A. D. 1885.

8. The Chancellor erred in ordering that the complainant pay the costs in this case within three months from the date of said decree or attachment.

9. The Chancellor erred in not decreeing that said complainant is not liable to pay the said judgments or either of them or any part thereof and that the complainant is entitled to be relieved from the payment thereof and to have said judgments discharged and annulled.

The case was heard on appeal Jaunary 19, 1900, before LORE, C. J., and GRUBB, PENNEWILL and BOYCE, J. J.

The case was argued by *B. Nields*, for the complainant below, appellant and *Lewis C. Vandegrift* and *Herbert H. Ward*, for the respondent, the Honorble Edward G. Bradford, who was also counsel for the respondent in the Court of Chancery, having, since the decision been appointed United States District Judge, for the District of Delaware.

The argument in the Supreme Court covered the same ground, precisely, as that before the Chancellor, and the briefs filed in the two Courts were almost identical.

The additional points on each side are here noted.

*B. Nields*, for complainant, called attention to the fact that the case of *Graves vs. Lebanon National Bank*, 10 *Bush* 23, upon which he had very much relied in the argument before the Chancellor, had since that time been approved and affirmed by the Court of Appeals of Kentucky; in the case of *Deposit Bank of Midway's Assignee vs. Hearn*, (decided by the Court of Appeals of Kentucky, December 1, 1898,) 104 *Ky.* 819, 823, 48 *S. W.* 160. The same case was also referred to with approval in another case in the Kentucky Court of Appeals. *Belleview Loan and Building Association vs. Jeckel*, 104 *Ky.* 159, 164.

He also cited a decision of the Supreme Court of the United States, *American Surety Co. vs. Pauly*, 170 *U. S.* 133,

151, in which Mr. Justice Harlan delivered the opinion, and in doing so, reviewed the case of *Graves vs. Lebanon National Bank*, among others, and observed that the cases relating to sureties in bonds given to corporations, arose directly between the sureties and the corporations represented by *their boards of directors or by some of the officers acting within the authority conferred upon them;* and that those relating to the liability of a principal by reason of the acts or representations of his agent arose out of the agent's acts or declarations, *in the course of the business entrusted to him.*

*Mr. Nields* also criticised the case of *Ashuelot Savings Bank vs. Albee*, 63 *N. H.* 152, on which the Chancellor commented at length in his opinion, and submitted, that there is a wide difference between the case of the savings bank and a national bank, and that an equity rule that applied to the surety in one case; would have no application to the surety in the other. This New Hampshire case does not appear to be cited or referred to in subsequently important reported cases where like questions are raised. It was not cited, nor does it appear to have been referred to in the late well considered case of *American Surety Co. vs. Pauly*, and I, therefore, infer that it is not regarded as an authority except in that State.

*Holden vs. New York and Erie Bank*, 72 *N. Y.* 286, 292, was also cited as a case in which the action was grounded on fraud of the cashier in matters with which he was connected, not only as cashier, but individually and as executor of an estate. The Court held that whatever knowledge, information or notice he had in either of these capacities he carried with him in to the exercise of the other.

*L. C. Vandegrift,* for the respondent, in addition to the authorities and arguments submitted in the Court of Chancery, contended that the argument on behalf of the complainant relating to fraudulent representations alleged to have been made by the appellee, comprising the alleged conversations between the cashier of the bank and the appellant, and the publication of the reports of the bank were not applicable to this case, because the corporation did not incur any liability by reason of either of these representations.

Those attributed to the cashier were not within the course of the business entrusted to him, nor within the authority conferred upon him. *American Surety Co. vs. Pauly*, 170 *U. S.* 133.

So, as to the publications,—the act of Congress requiring the reports to be published is not a provision for aiding the employes of the bank in obtaining sureties on their official bonds; and the requirement of publication does not establish, between the bank and the public, such privity, as to authorize any one to become a surety of an employe on the faith of a statement, in the published reports, that the examinations were thorough. *Savings Bank vs. Albee*, 63 *N. H.* 152.

*Mr. Vandegrift* also commented upon the effort, on behalf of the appellant, to overcome the force of *Savings Bank vs. Albee*, by the decisions of the Kentucky Court of Appeals. *Graves vs. Lebanon National Bank*, 10 *Bush* 23, was before the New Hampshire Court and the two cases must be considered together.

It would of course be natural for the recent Kentucky case of *Deposit Bank, et al. vs. Hearne*, to follow the prior decision. It is, however, perfectly consistent with the last Kentucky decision that knowledge of the clerk's dishonesty was actually brought home to the corporation prior to the time it took the defendant's bond.

These Kentucky decisions are not consistent with reason or authority, nor with *American Surety Co. vs. Pauly*, 170 *U. S.* 133, which the appellant tries to bring to their support.

Reference may also be made to a contention on appellant's behalf that there was error in finding that Smith's term of office continued during the entire twelve years succeeding November 1, 1879, the date of the first bond. If this contention means that Smith was elected for a less time or that the by-laws of the bank named a shorter term than six years, and, therefore, the appellant, as surety, was not bound longer than the actual term Smith was elected to serve, under the by-laws or usage of the bank, then it is submitted such a contention cannot be supported.

Under the terms of these bonds the appellant, with others, bound himself, for the fidelity of Smith, "for and during the entire time the said Peter T. E. Smith may be employed in said office of teller as aforesaid, &c." The Act of Congress under which the bank was organized provided that its board of directors might appoint a cashier, and other officers, require bond of them and fix the penalty thereof, and dismiss them at pleasure and appoint others to fill their places. *Rev. Stat. U. S. sec.* 5136.

The by-laws of the bank could not repeal or modify the Act of Congress and the articles of association under which the by-laws were enacted.

Suppose there were several successive appointments of Smith as teller. They would have no more effect upon the term of his office or upon the liability of this surety than the second deed of the same property, by one who had already conveyed it to the same grantee, would have. The only act of the directors that could affect the tenure of Smith's office, under the Act of Congress, would be his dismissal.

As to the point that the bonds in question are but contracts, it is submitted that they are not so much contracts of suretyship as they are contracts of insurance. It has been well said that "While in contracts like this, the more natural attitude of a 'surety' is assumed by the form, it is, in effect, one of insurance; and whatever indefiniteness of language, or ambiguity of expression, there may be, should be resolved most favorably to the assured, not only because it is the language of the insurer, but also because the general purpose of the contract is full indemnity, and this should not be defeated except by clear and unambiguous limitations assented to by the parties."*

It is also further submitted that "the settled judicial construction of a statute, so far as contract rights were thereunder acquired, is as much a part of the statute as the text itself, and a change of decision is the same in effect on pre-existing contracts as a repeal or an amendment by legislative enactment." *Sutherland, Stat. Constr. sec.* 474.

*The authority for this quotation does not appear in the brief.

This thought must have been in the mind of the Chancellor when in concluding his opinion, he said, "I cannot refrain from referring * * * to the concluding words in the opinion of Chancellor Bates, which I have already quoted, and which were intended to serve as words of warning to prevent the occurrence of just such cases as this, and were uttered ten years before the complainant entered into the contract of suretyship from the disastrous consequences of which he now seeks to be relieved by the active interposition of the Court of Chancery."

LORE, CHIEF JUSTICE, delivered the opinion of the Court:—

Nathan Lieberman, the appellant, one of the sureties on two official bonds of Peter T. E. Smith, late paying teller of the First National Bank of Wilmington, has appealed in this case from the decree of the Chancellor made December 3, 1898, which dissolved a preliminary injunction granted by the late Chancellor Wolcott, November 6, 1893, restraining the bank from collecting the amount of certain defalcations of Smith, made by him while acting as teller of the said bank,

The bonds bore date, respectively, November 1, 1879, and July 6, 1885. Each bond was in the penal sum of $15,000, and set forth that said Smith had been duly elected and chosen teller of the bank, during the pleasure of the board of directors; and each was conditioned for the faithful discharge of the duties of his office as teller of the said bank.

Annexed to each bond was a joint and several warrant of attorney to enter judgment thereon.

During the life of the first bond, between November 1, 1879, and July 6, 1885, Smith fraudulently abstracted funds of the bank to the amount of $11,650. During the life of the second bond, between July 6, 1885, and July 5, 1891, he so abstracted $27,750. These defalcations were fraudulently concealed by false entries made by Smith on the books of the bank. The defalcations were discovered about February 18, 1893, and a full confession was made by Smith.

Upon the 24th day of February, 1893, judgment was

entered in the Superior Court of the State of Delaware on each of said bonds; said judgments being No. 299 to February term, 1893, on the bond of November 1, 1879, and No. 301 to the said term, on bond of July 6, 1885. On the latter judgment, execution was issued October 19, 1893, and thereunder the goods and chattels of Lieberman were taken in execution, and were about to be advertised and sold, when further proceedings were restrained by the preliminary injunction of November 6, 1893.

The chief assignments of error relied on and urged in the brief and argument in behalf of the appellant were:

(1) That the bonds were void as to Lieberman because he was induced to become surety thereon by fraudulent representations of the respondent.

(2) That, at the time of the entry of the judgments, action on the bonds was barred by the statute of limitations.

*First.* The appellant contends that, under the evidence in this case, there is clear proof that, immediately before complainant became surety on the bond November 1, 1879, he had a conversation with George D. Armstrong, cashier of said bank; that Armstrong then told him that he would run no risk in becoming surety for Smith, as he was "a good, reliable, honest man, and his accounts are all straight, and as paying teller he cannot take anything;" and that he had read the published statements of the bank, showing its then resources and liabilities. That immediately before complainant became surety on the bond of July 6, 1885, he had a further conversation with George D. Armstrong, cashier of the bank; that Armstrong then told him that Smith's books and everything were straight. and that "there was no risk whatever in going on his bond again;" and that he had read the statements of the bank, with its then resources.

Complainant avers that he was induced to become surety for Smith, because of such statements made to him by the cashier, and by the published reports of the bank, showing its resources and liabilities, immediately before he became surety; that these reports were made and published pursuant to an Act of Congress, and the cashier, who made oath thereto, and

the directors, who certified to the correctness thereof, did so under the authority conferred upon them, and in discharge of a duty imposed upon them by law; that, from the facts thus proved, the bonds signed by the complainant are void as to him, because he became surety thereon by reason of such fraudulent representations of the respondent.

It nowhere appears in the testimony that Armstrong, the cashier, was authorized by the bank in any way to make representations in this matter of surety on Smith's bonds, or that it was in the line of his duty as cashier to do so. Any statements made by him to Lieberman as to Smith's honesty, the condition of his books and accounts, and the probable risk to his surety, could, therefore, in no wise bind the bank. Lieberman took them at his own risk, as the individual judgment of Armstrong. The Supreme Court of Kentucky, in *Graves vs. Lebanon National Bank*, 10 *Bush* 23, held that published reports of the assets and liabilities of a national bank, under the acts of Congress, which were false, but which, under the proof, induced a person to become surety on the official bond of the cashier of the bank, made the bond void as to such surety, and relieved him from liability thereon. The contrary doctrine is maintained in *Ashuelot Savings Bank v. Albee*, 63 *N. H.* 152; where, after reviewing the Graves case, the Court says: "Such report was not due to persons considering the question of becoming sureties of the treasurer. It was a duty imposed by statute for the benefit of depositors, and not to enable a reader of the public reports to determine whether the treasurer was a man whose official bond he could safely sign." This reason applies with equal force to the case now before us. It is difficult to perceive upon what principle of law or equity such published reports of the bank can be held as an inducement to Lieberman to become surety on Smith's bond. They were not made by the bank for that purpose. Their publication from time to time had no relation to such suretyship; nor did they disclose upon their face whether Smith was honest or dishonest. If Lieberman saw fit to draw from such reports the conclusion that he could safely become surety on Smith's official bond, it was unquestionably his

own volition, and without participation of the bank, and for which the bank should not be held responsible. There seems to be, therefore, nothing either in the statements of the cashier, Armstrong, or in the published reports of the bank, that would relieve Lieberman of his liability as surety on the bonds.

*Second.* The main and most important question in this case is raised by the statute of limitations. The statute relating to bonds of this character is as follows: "No action shall be brought upon any bond given to the president, directors and company of any bank, or to any corporation, by any officer of such bank or corporation, with condition for his good behavior or for the faithful discharge of the duties of his station, or touching the execution of his office, against either principal or sureties, after the expiration of two years from the accruing of the cause of such action; and no action shall be brought, and no proceeding shall be had upon any such bond or upon any judgment thereon, against either principal or sureties, for any cause of action accruing after the expiration of six years from the date of such bond." *Rev. Code*, 889, *sec.* 11.

No question in this case arises under the last clause of the law, as the evidence shows that all the defalcations occurred within six years from the date of the bond under which they are claimed in each case. We have, therefore, only to deal with the two years limitation in the first clause. Judgment was entered February 24, 1893. Three items of defalcation under the bond of July 6, 1885, viz.: April 11, 1891, $500; July 2, 1891, $500; July 3, 1891, $1,500; amounting to $2,500, are within the two years, and would not be affected by the statute in any event. The residue of the defalcations are without the two years.

Does the statute of limitations bar recovery, as claimed by the appellant?

It was shown in the evidence that Smith had fraudulently abstracted $4,600 of bank funds at the date of the first bond, November 1, 1879; that under that bond he so abstracted $11,650, and under the bond of July 6, 1885, $27,750; that

all these peculations were fraudulently concealed, by entries and alterations so skilfully made by him on the books of the bank, as to escape detection until he made disclosure of the same about February 18, 1893; that during all that time he was a capable and trusted officer of the bank, enjoying the confidence of his employers and of the community.

The respondent contends that the bar of the statute is removed by the concealed fraud of Smith.

The question whether the fraudulent concealment of the existence of the cause of action will hinder the operation of the statute of limitations, is one which has been much discussed, and upon which there has been a radical difference of opinion. On one side it is said that the statute in plain terms fixes the time when action shall be brought after the cause of action accrues; that the cause of action accrues when the act is done and the fraud is consummated; and from that time, and not from the time the plaintiff discovered it, the statute interposes as a protection; that while courts of equity may make an exception in cases of fraud, because they are not strictly bound by the statute, yet for courts of law to do the same is to except from the law, cases which are plainly within its terms. On the other side, it is said, the statute must be expounded reasonably, so as to suppress, and not to extend, the mischiefs it was intended to cure; that it was intended to suppress fraud, by preventing unjust claims from starting up, after a great lapse of time, when evidence by which they might be repelled was forgotten or had ceased to exist; that it should not, therefore, be so construed as to encourage fraud, by enabling those who, through falsehood or deceit, have managed to keep one in ignorance of the fact that he had a cause of action, to take advantage of their own wrong-doing, under a plea of the statute.

"We think," says the Court in *Reynolds v. Hennessy* 17 *R. I.* 169, 23 *Atl.* 639, "the latter position is best sustained by reason and authority. It certainly is in the line of justice and morality. The only objection to it is that it introduces an exception into the statute." The same objection lies to claims in favor of the government, and to cases of new promise.

The statute does not take away the debt, but simply affects the remedy. Hence, if one, by fraud, conceals the fact of a right of action, it is not ingrafting an exception on the statute to say that he is not protected thereby, but it is simply saying that he never was within the statute, since its protection was never designed for such as he. By fraud he has put himself outside of its pale. Whether this be taken as an exception, or only a limitation of the statute, it rests upon sound reason and just policy. *Reynolds vs. Hennessy, supra; Bree vs. Holbeck,* 2 *Doug.* 655 (Lord Mansfield); *South Sea Co. vs. Wymensdell,* 3 *P. Wms.* 143.

Such a construction has been so frequently applied to the statute, that it is now said to have the weight of authority in its favor. Massachusetts, Maine, New Hampshire, Pennsylvania, Illinois, Indiana, and Texas are among the states supporting this view; while the contrary has been held in New York, Virginia, North Carolina, South Carolina, and New Jersey.

In *Turnpike Co. vs. Field,* 3 *Mass,* 201, Chief Justice Parsons uses this language: "That, where the delay in bringing the suit is owing to the fraud of the defendant, the cause of action ought not to be considered as having accrued until the plaintiff could obtain knowledge that he had a cause of action; and if this knowledge was concealed from him by the defendant, fraudulently, the Court would violate a sacred rule of law if they permitted the defendant to avail himself of his own fraud."

The reason, given by Lord Redesdale, in *Hovenden vs. Lord Annesley,* 2 *Sch. & Lef.* 634, why the statute should not operate as a bar where fraud has been concealed by one party until it has been discovered by the other, is "that the statute ought not, in conscience, to run; the conscience of the party being so affected that he ought not to avail himself of the length of time."

Whatever may be the conflict in courts of law upon this point, it is, without controversy, the settled doctrine in courts of equity. *Ang. Lim. sec,* 183; *Carter vs. Murray,* 5 *Johns. Ch.* 522.

But it is insisted, that, while this rule prevails against the person who committed the fraud, a different rule exists in favor of innocent sureties, who had no knowledge of, and did not participate in, such fraud.  That while Smith, who fraud-ulently concealed his peculations, would not be suffered to shield himself behind the statute, Lieberman, his surety, who is innocent of fraud, has a right to set up the statute as his protection.

In cases like this, is there any such distinction between the liability of principal and surety?

In *Charles vs. Haskins*, 14 *Iowa*, 473, which was an action against sheriff's sureties, for wrongful seizure of goods under an execution, the Court says:  "The governing principle is that the liability of the surety is dependent upon that of the principal."

In *Zent's Ex'r. vs. Hart*, 8 *Pa. St.* 337, which was an ac-tion against a surety on a promissory note barred by the statute, where the principal had paid interest within six years, Chief Justice Gibson held that "the decisions at length have settled that the payment of one is the acknowledgment of both, whenever it has been made during their joint respon-sibility,—in other words before it has been severed by the death of one of them."

In *Boehmer vs. County of Schuylkill*, 46 *Pa. St.* 452, which was an action against sureties on a county treasurer's bond, where the defense was that the county commissioners had exceeded their power in borrowing the money which came into the treasurer's hands, and that the money so received was not within the bond, the Court (Chief Justice Wood-ward) says, "In so far as the principal is liable by the mere force and terms of the bond, the surety is bound with him."

In *Patterson's Appeal*, 48 *Pa. St.* 342, the sureties of an absconding assignee, who was trustee for the benefit of cred-itors, were held not entitled to credit on account which their principal could not claim, by reason of fraud.  Strong, J., says: "The sureties stand in no better position than Smith their principal stands in.  The measure of his responsibility is the measure of theirs."

In *Bradford vs. McCormick*, 71 *Iowa* 129, 32 *N. W.* 94, which was an action against the sureties of a justice of the peace for money collected and fraudulently concealed until the statute had run, the Court says: "The statute in this case is pleaded by the sureties, and they have not been guilty of any fraud; but they, without doubt, we think, are bound by the fraudulent conduct of their principal. The liability of the surety is dependent upon the liability of the principal. The ordinary rule is that, if the principal is bound, so is the surety."

This point has been directly adjudged in this State. In *Sparks vs. Farmers' Bank*, 3 *Del. Ch.* 275,—a case against the sureties of a defaulting cashier of the bank,—the precise question was determined. The Chancellor there held that the bank was entitled to collect of the sureties so much of the defalcations as occured more than two years previous to the entering of the judgment on the bond, for the reason that "their equity to do so arises out of the fact that the defalcation was a fraud concealed from the bank, with respect to which a court of equity will not permit the statutory bar to be set up until the lapse of the prescribed term after the discovery of the fraud."

This case was argued by some of the ablest lawyers of the State. While it is true that the distinction between the liability of surety and principal, in cases like this, where there is concealed fraud, does not seem to have been raised and dwelt upon by counsel for the sureties, still it is only fair to assume that the failure to do so did not arise from any lack of knowledge or research, but, rather, from lack of material for, and confidence in, such a defense.

The case of *Grimshaw vs. Mayor, etc.*, 5 *Del. Ch.* 183, which was against the sureties of a defaulting treasurer of the city of Wilmington, has been urged as countervailing this doctrine. The Chancellor, in his opinion, expressly excepts cases like the present out of his consideration, in the following language: "I shall not enter into a general discussion of the principle applicable to a case where a concealed fraud has been proved to exist on the part of the defendant, in a suit brought

against him, after the discovery of the fraud has been made, but not within the period mentioned in the statute in that respect, to make him account for the amount of said fraud, because I am of the opinion that the principles adjudged in cases of that kind, where the statutory limitations has been pleaded as a bar to the cause of action, are not applicable to the case before me. It is true * * * that where one person defrauds another of his just rights, and the fraud is concealed at the time of its commission, and not discovered within the period embraced by the statute of limitations, the party defrauded has a right to bring his action for the recovery of the amount of which he has been defrauded at any time within the proper legal period for bringing actions."

The cases of *Hudson vs. Bishop*, 32 *Fed. Rep.* 519; *United States vs. Mark's Sureties*, 3 *Wall. Jr.* 358, *Fed. Cas. No.* 11,990, and of *Pratt vs. Northam*, 5 *Mason* 95, *Fed. Cas. No.* 11,376, relied upon by counsel for the appellant, do not seem to modify this principle relating to sureties.

It therefore seems to be established that, in cases on official bonds, concealed fraud on the part of the principal will deprive both principal and surety of the benefit of the statute of limitations; that the statute does not begin to run until the fraud is discovered.

The reason seems to be that in such bonds the sureties guarantee the good conduct and faithfulness of the principal, in the discharge of the duties of his office, and that, in equity and good conscience, they should not be exempt from liability for his misconduct and peculations, when by fraudulent concealment, he has prevented discovery until the time limited by the statute to bring action has expired.

Any other construction would make the very frauds against which the sureties covenanted the means for relief from liability.

The bond in such case, instead of securing the faithfulness of the officer, would tend to promote on his part skilfully and fraudulently concealed peculations, and would be an inducement to fraud.

If concealed fraud, which the principal undertakes not

to perpetrate, deprives such principal of the protection of the statute, is it not equally reasonable that the undertaking of the surety that such fraud should not be perpetrated should exclude the surety also? The principal undertakes not to commit fraud; the surety guarantees that he shall not commit fraud. There would seem to be no substantial reason why their respective liabilities for such fraud should be different.

It may seem hard that, by reason of the fraud of a principal, the liability of an innocent surety should be continued for many years after the expiration of the time named in the statute of limitations. The hardship would be greater if another equally innocent person should be made to suffer by such fraud in cases where the surety undertakes that the principal shall be faithful and honest in that very matter. The equities being equal as to innocence, the added burden of his obligation rests upon the surety.

"It is true that equity will not relieve against the bar of the statute, in favor of the party who has been in *laches* in not using means within his power to discover the fraud." *Sparks vs. Farmers' Bank*, 3 *Del. Ch.* 306.

It must be remembered that in these bonds Lieberman undertook for the fidelity of Smith absolutely and at all events, and engaged unconditionally to make good his defaults. True it is, he contracted in view of the statute of limitations. It is equally true that he contracted in view of the law contained in adjudged cases in this State controlling the application of the statute.

The rule is that: "It is good faith, and not diligence, which is required of the creditor as a condition of his right to hold the surety; but the creditor or obligee in a bond is not obliged, for the benefit of sureties, to watch the principal. It is because it is really impracticable for this to be done effectively and at all times, on the part of large corporations, that official bonds are required. To subject the responsibility of such sureties to so indefinite a question, as whether due diligence has been exercised by directors, would render these securities worthless." *Id.* 302.

Judge Thompson, in *Wayne vs. Commercial National*

*Bank*, 52 *Pa. St.* 349, thus defines the diligence required in the officers of a bank: "I know of no positive duty resting on the officers of the bank to investigate with a view to inform a surety, in the absence of any inquiry or request of him to do so. Had such a request been made, and it had been denied or evaded, a different question might have been presented. Neither the bank nor its officers knew or had reason to suspect, so far as we can learn, the defalcation afterwards discovered."

Chief Justice Shaw tersely says in *Amherst Bank vs. Root*, 2 *Metc.* 540, that negligence of directors and their agents is no excuse.

In a case cited by the appellants, *Graves vs. Lebanon National Bank*, 10 *Bush.* 28, the measure of diligence is thus defined: "The directors may have been negligent in the discharge of their duties, and this negligence may have enabled Mitchell for the time to misappropriate the funds of the bank, and to conceal its true condition by the false reports made to the Comptroller of the Currency, and by false entries upon the books of the association; but this negligence cannot avail the sureties, who covenanted that their principal should well and truly perform the duties of his position. Their covenant is unconditional, and no failure of duty on the part of the directors of the association, short of actual fraud or bad faith, can be deemed sufficient to exonerate them from its performance."

The testimony in this case discloses no such *laches* as would discharge the surety.

It shows that Smith was generally esteemed as an honest and capable officer; that the usual examinations of the condition of the bank from time to time were had, both by the officers of the bank and by a government examiner; that no suspicion of the defalcations of Smith existed in the mind of any one at any time prior to February, 1893; that Lieberman made no request for an examination of Smith's accounts; that the defalcations were therefore concealed by Smith, who was a skilled accountant. There is no claim that the bank did not exercise good faith towards the surety at all times.

A careful examination of this case discloses no ground for the relief of the surety. The decree of the Chancellor in that respect is therefore affirmed. Inasmuch, however, as it appears from the entire record that certain errors have been inadvertently incorporated into the decree of the Chancellor in respect to the date of the first bond, the duration of the defalcation under the second bond, and the allowance of interest on the penal sum of each bond, it is the judgment of this Court that said surety is liable for the defalcations of said Smith, with interest from the date of each defalcation to the 3d day of December, 1898, the date of the decree of the Chancellor in this case, provided the aggregate sum of the principal and interest ascertained to said date on each bond shall not exceed the penalty thereof; and the said surety is also further liable for interest on such aggregate sum so ascertained from the said 3d day of December, 1898, the date of said decree.

The following decree was entered:

And now to wit, this the 19th day of January, 1900, it appearing to the Court that on the 3d day of Deecmber, 1898, it was ascertained by the decree of the Chancellor, in this case, that there was due on each of the said bonds a sum in excess of $15,000, the penalty thereof: Now, therefore, it is ordered, adjudged, and decreed that the said The First National Bank of Wilmington, the respondent, have liberty to collect on each of its judgments entered on each of the said bonds in the Superior Court of the State of Delaware, in and for New Castle County, against Nathan Lieberman, the appellant, the sum of $15,000, with interest thereon from the 3d day of December, 1898, the date of the said decree, and the date of the authoritative and legal ascertainment of the amount due on each of the said bonds. And it is further ordered that the appellant pay the costs in this case within three months, or attachment.

NOTE.—The statement in the opinion of the Supreme Court, delivered by the Chief Justice, that "it appears from the entire record that certain errors had been inadvertently incorporated into the decree of the Chancellor in respect to the date of the first bond, the

duration of the defalcation of the second bond and the allowance of interest on the penal sum of each bond," seems to render it necessary, in order to make the report of this important case perfectly intelligible, to make the following references to the decree and opinion of the Chancellor:

(1) "The date of the first bond." This date is stated in the Chancellor's decree as November 1, 1879. The date is so stated in the bill, and is admitted by the answer to be correct; it so appears in the copy of the bond itself filed as complainant's exhibit "B" on page 7 of the transcript of the exhibits as printed for the Supreme Court; and the same date is given in the opinion of the Supreme Court as reported in 2 *Pennewill* 417.

(2) "The duration of the defalcation under the second bond." There is an erroneous date which occurs twice in the decree of the Chancellor, but, when taken in connection with the whole decree, it appears to be merely a clerical error, for although the date given in this decree, as the date at which the liability of the sureties in the second bond terminated, is incorrectly stated, yet the defalcations enumerated in the decree, and for which the sureties are held liable, are correctly stated, and the list as contained in the decree is confined to the proper dates according to the view which was taken by the Chancellor in his opinion, and affirmed by the Supreme Court. The decree, therefore, does contain an erroneous date, but does not use it in calculating the amount due.

(3) "The allowance of interest on the penal sum of each bond." The Chancellor in his decree permitted the interest on the penal sum of each bond to be collected from the date of the judgment, under warrant of attorney, on each bond, after hearing argument, and considering supplemental briefs on the form of the decree, as appears *ante pp.* 262 to 279.

This is the precise point in which the decree of the Chancellor was varied by the decree of the Supreme Court, inasmuch as the allowance of interest upon the penalty of each bond in the decree of the Supreme Court is from the date of the Chancellor's decree, instead of from the date of the judgment on the bond.